No. 101,641

STATE OF KANSAS, *Appellee*, v. JOHN STEVEN MARSHALL, *Appellant.*

(281 P.3d 1112)

Opinion filed July 27, 2012.

*Korey A. Kaul*, of Kansas Appellate Defender Office, argued the cause and was on the brief for appellant.

*Jason E. Geier*, senior assistant district attorney, argued the cause, and *Chadwick J. Taylor*, district attorney, and *Steve Six*, attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

LUCKERT, J.: John Steven Marshall was convicted by a jury of burglary of a nonresidence, criminal damage to property, and obstruction of a legal duty. The strongest evidence against Marshall was an eyewitness' identification of Marshall as the burglar. On appeal Marshall raises two issues related to the eyewitness' identification.

First, Marshall argues the prosecutor committed misconduct during closing argument by vouching for the eyewitness' credibility. In response, the State argues the prosecutor's comments were in response to defense counsel's comments about the eyewitness' credibility and cannot be considered prejudicial because the defense opened the door to the prosecutor's comments. We reject the State's argument and, clarifying inconsistent statements in our past decisions, hold that a prosecutor can commit prejudicial misconduct when responding to comments—even improper comments—by defense counsel. Under the facts of this case, however,

we conclude any misconduct committed by the prosecutor was harmless.

Second, Marshall argues the trial court erred in instructing the jury on eyewitness identification using PIK Crim. 3d 52.20 because the instruction allowed the jury to consider the certainty with which the eyewitness identified the defendant. We recently held it is error for a trial court to give this portion of the eyewitness identification instruction. Nevertheless, because Marshall did not object to the instruction in this case, he must establish that the instruction was clearly erroneous, and we conclude he has failed to meet this burden.

Consequently, we affirm Marshall's convictions.

### FACTS AND PROCEDURAL BACKGROUND

On December 22, 2007, around 6 p.m., Ralph Mosher; Mosher's son-in-law, John Huckabee; and their spouses were in Mosher's residence when an alarm on Mosher's security system was triggered; sensors showed a door on a backyard shed had been opened.

Mosher and Huckabee went outside to check out the situation. Mosher walked toward the shed, and Huckabee stood closer to the house. Huckabee saw a man come out of the shed and walk toward him. Huckabee yelled, and the man turned away and went down the alleyway. Huckabee testified he could see the man's face before he turned away; Huckabee described the individual as an "African-American male" who was wearing dark jeans, a long-sleeve shirt or jacket of some kind, and some sort of hat. He also stated that the man came out of the shed carrying two cases, which Huckabee described by saying, "[I]t appeared to be, if anybody knows what the Walt drill casing looks like when it comes, that's what it looked like." There was no writing on the cases and they were "solid black" according to Huckabee. At trial, Huckabee identified Marshall as the man who exited the shed; the prosecutor asked Huckabee if he was certain Marshall was the man who walked out of the shed, and Huckabee replied that he was.

After the man took off down the alleyway, Huckabee went through the house and got into his vehicle to follow the man. Huckabee also called law enforcement dispatch to report the man's lo-

cation. When the man walked between buildings, Huckabee lost sight of him. Huckabee thought he spotted the man again at a nearby convenience store. He reported the new location to the dispatcher and, while on the telephone, realized the person at the convenience store was a woman. Driving on, he soon spotted the man, who was about to enter a liquor store. Huckabee noticed the man no longer had the black cases.

According to Huckabee, the man was in the liquor store for less than a minute. When the man came out of the store, Huckabee thought the man was empty handed. Huckabee told the dispatcher that the suspect was heading down the street. Soon after, Huckabee saw a law enforcement officer confront the man. Dispatch told Huckabee to park somewhere so an officer could find him and take his statement. Huckabee pulled his car into a nearby parking lot and lost sight of the officer and the man.

Sergeant Kristen Hren of the Topeka Police Department was the officer who confronted the man—who turned out to be Marshall—as he left the liquor store. She asked Marshall to step behind her patrol car and to place his hands, in which there was a paper sack, behind his back. She attempted to handcuff Marshall but had difficulty getting the cuffs on over his coat. Marshall escaped, and Hren notified the dispatcher that she was in foot pursuit of the suspect.

Huckabee saw Marshall running towards him and recognized him as the same man who had come out of Mosher's shed, although the man was no longer wearing a jacket. Marshall came up to the passenger's side of Huckabee's car and asked for a ride. Huckabee refused and told Marshall that he was waiting for someone. Marshall took off running.

Officer John Whitehead was at Mosher's residence when he was notified that Hren was chasing Marshall. Whitehead left to assist Hren. Whitehead saw a man fitting the suspect's description, got out of his patrol car, and identified himself as a law enforcement officer. The suspect continued to run away, and Whitehead followed on foot. The chase continued until Marshall slipped. Marshall later explained that he ran because he did not want to spend Christmas, which was just a few days away, in jail.

After Marshall was detained, Hren went to Mosher's residence to take witness statements and photographs. Hren observed a footprint on the shed door where it had been kicked in and damaged. This led to the collection of Marshall's boots as evidence. According to Hren, the pattern of the footprint on the door appeared to match the pattern of Marshall's boots. However, photographs of the footprint and the boots were not sent for forensic comparison.

At trial, defense counsel cross-examined Huckabee extensively about details he observed or did not observe and, in closing argument, methodically pointed out the various reasons Huckabee's testimony was not credible. For example, defense counsel pointed out inconsistencies and vagueness in Huckabee's description of Marshall's clothing, Huckabee's misidentification of a woman as Marshall, and the fact that Huckabee did not maintain sight of Marshall continuously during the events. Defense counsel argued Huckabee missed important details such as the fact that Marshall was carrying a sack when he left the liquor store. Huckabee, according to defense counsel, "was not a very observant person," "[h]e misses a lot of facts," "[h]e's extremely definite about his testimony, but he's also very wrong," and "[h]e makes a lot of mistakes." Additionally, defense counsel warned the jury that misidentification was a frequent cause of wrongful convictions. Obviously, all of these arguments were defense counsel's attempt to undermine the credibility of Huckabee's identification of Marshall.

In response, the prosecutor argued:

"Use your common sense, ladies and gentlemen. Mr. Huckabee, to listen to [the] defense, you'd think Mr. Huckabee was the one on trial here and he's the one that's trying to trick everybody, he's full of miss-identification [sic], he's not honest. *Well, I would submit to you that he is an honest person.* That's the reason you have these small variations. You know, 'Maybe he was wearing black, maybe he was wearing blue jeans, I can't tell.' That's what a person does when they're trying to tell you exactly what happened.

"It's not unusual for anyone to forget small, what I would consider irrelevant or minor factors from day-to-day. I would bet you, if I brought all thirteen of you back here tomorrow and make you describe the suit I had on and my tie and shoes, I would probably get thirteen slightly different answers. That does not mean a person is not accurate. That does not mean there's miss-identification [sic]. He came—he saw—he got looks at Mr. Marshall several times on that evening. *He's very honest.* He said, 'Yeah, I lost contact with him, but I kept seeing the same

guy.' If I look at you and I go down to my office and come back seven minutes later, I see you again, I can still identify you. That doesn't mean anything that I lost contact with you. For identification to be good, you don't have to have your eye on them every minute." (Emphasis added to highlight the statements Marshall challenges in his appeal.).

After the jury convicted Marshall of burglary of a nonresidence, criminal damage to property, and obstruction of legal duty, Marshall appealed to the Court of Appeals. He argued the prosecutor's two statements regarding Huckabee's honesty were improper bolstering of Huckabee's credibility, constituted prosecutorial misconduct, and thus violated his right to a fair trial. In addition, for the first time on appeal, Marshall claimed the trial court erred when it instructed the jury that an eyewitness' certainty in identifying the defendant was a factor that could be considered in evaluating the credibility of the identification. The Court of Appeals rejected both of Marshall's arguments. *State v. Marshall*, No. 101,641, 2010 WL 481276 (Kan. App. 2010) (unpublished opinion).

Marshall sought this court's review of the Court of Appeals' decision, arguing in part that the Court of Appeals failed to recognize clear prosecutorial misconduct and that this court had accepted review in at least one other case where the certainty factor of the eyewitness identification instruction was being challenged. He asked for the same review of his case. This court accepted review and has jurisdiction under K.S.A. 20-3018(b) and K.S.A. 22-3602(e).

## PROSECUTORIAL MISCONDUCT

We first consider Marshall's argument that his convictions should be reversed because of the prosecutor's misconduct in vouching for Huckabee's honesty. Appellate review of an allegation of prosecutorial misconduct requires a two-step analysis. First, an appellate court decides whether the comments were outside the wide latitude that a prosecutor is allowed in discussing the evidence. Second, if misconduct is found, an appellate court must determine whether the improper comments prejudiced the jury against the defendant and denied the defendant a fair trial. *State v. Bennington*, 293 Kan. 503, 530, 264 P.3d 440 (2011); *State v.*

*Inkelaar*, 293 Kan. 414, 428, 264 P.3d 81 (2011); *State v. Tosh*, 278 Kan. 83, 85, 91 P.3d 1204 (2004); see *State v. Pabst*, 268 Kan. 501, 505, 996 P.2d 321 (2000).

*Step One: Misconduct*

" 'In general, prosecutors may not offer juries their personal opinions as to the credibility of witnesses.' " *State v. Stone*, 291 Kan. 13, 19, 237 P.3d 1229 (2010) (quoting *State v. McReynolds*, 288 Kan. 318, 325, 202 P.3d 658 [2009]). A prosecutor is not allowed to offer a personal opinion because such a comment is "unsworn, unchecked testimony, not commentary on the evidence of the case." *Pabst*, 268 Kan. at 510; see Kansas Rules of Professional Conduct (KRPC) 3.4 (2011 Kan. Ct. R. Annot. 566) ("A lawyer shall not: . . . [e] in trial, . . . state a personal opinion as to the justness of a cause, the credibility of a witness, the culpability of a civil litigant or the guilt or innocence of an accused."); KRPC 3.8 (2011 Kan. Ct. R. Annot. 578) (special duties of a prosecutor).

We need not discuss whether the prosecutor committed misconduct because at oral argument the State conceded the comments should not have been phrased as they were. Because the State does not dispute the issue, we will not analyze whether the comments—"I would submit to you that he is an honest person" and "[h]e's very honest"—were improper and will proceed to a harmlessness inquiry.

*Step Two: Harmlessness Inquiry*

When a prosecutor makes an improper comment during closing arguments, an appellate court conducts a harmlessness inquiry, determining whether the misconduct was so prejudicial that it denied the defendant a fair trial. Three factors are considered in making this determination. First, was the misconduct gross and flagrant? Second, was the misconduct motivated by ill will? Third, was the evidence of such a direct and overwhelming nature that the misconduct would likely have had little weight in the mind of a juror. None of these three factors is individually controlling. *Inkelaar*, 293 Kan. at 427 (quoting *State v. Adams*, 292 Kan. 60, 66, 253 P.3d 5 [2011]); see *McReynolds*, 288 Kan. at 323; *Tosh*, 278 Kan. at 85.

The State, at least in part, lumps together the gross and flagrant and ill will prongs in arguing the misconduct was not prejudicial. In doing so, the State emphasizes that there is no indication the prosecutor's comments were preplanned or calculated; instead, the comments were spur-of-the-moment responses to defense counsel's argument. Further, the State suggests we should consider that the prosecutor's comments were in response to defense counsel's "opening of the door" by saying Huckabee was "wrong" and "mistaken." The State at least implies that these statements amounted to defense counsel testifying by giving a personal opinion regarding the witness' credibility. See *Pabst*, 268 Kan. at 506 ("Our rules of conduct clearly and unequivocally say that it is improper for a lawyer to comment on a witness' credibility."); KRPC 3.4(e) (prohibiting attorney from commenting on credibility).

We note that it is not clear that defense counsel's statements, when read in context, were an expression of personal opinion regarding Huckabee's credibility or merely a suggestion that the jury could conclude that Huckabee's observations were contrary to other evidence. Nevertheless, just as we are not analyzing the prosecutor's comments to determine if there was misconduct, we will assume defense counsel opened the door by stating a personal opinion regarding Huckabee's credibility.

With that assumption, we consider the State's suggestion that the prosecutor's misconduct cannot be considered prejudicial because defense counsel opened the door. In making this argument, the State does not go so far as to suggest defense counsel's opening of the door means there was no prosecutorial misconduct. In fact, the State clearly acknowledges in its brief "that the Kansas Supreme Court has held that the fact that the defense may have opened the door to the issue of whether the State's witnesses were lying does not insulate the State from claims of misconduct." The State then cites *State v. Manning*, 270 Kan. 674, 701, 19 P.3d 84 (2001). Nevertheless, the State argues the defense's opening of the door means the misconduct cannot be prejudicial—in other words, it cannot be considered gross and flagrant or motivated by ill will. This distinction has some support in our prior cases but is contrary to other cases.

In discussing the two disparate lines of cases, *Manning* provides a starting point. In that case, the focus was not on whether a prosecutor had vouched for the credibility of a witness but on whether a prosecutor committed misconduct by repeatedly asking a defendant to comment on the truthfulness of other witnesses. After holding it was improper to ask a witness to comment on the credibility of another witness, we discussed whether the conduct could be excused because the defendant had stated during his direct testimony that the witnesses were not telling the truth. We held the open-the-door rule did not permit a prosecutor to ask a clearly improper question and explained that "[a]lthough the prosecution may present evidence in an area that is normally forbidden after a defendant has opened the door, the 'open door' rule does not apply to misconduct of counsel. The 'open door' rule only applies to evidence." *Manning*, 270 Kan. at 701.

Soon after the decision in *Manning*, however, this court stated: "We have held that there is no *prejudicial* error when questionable remarks made by a prosecuting attorney are provoked and made in response to previous arguments or statements of defense counsel." (Emphasis added.) *State v. McKinney*, 272 Kan. 331, 347, 33 P.3d 234 (2001). The *McKinney* court cited several cases supporting this view. *Manning* was not cited, leaving it unclear whether the *McKinney* court was rejecting the *Manning* holding or was drawing a distinction between conduct that was not excused from being misconduct by the open-the-door rule and conduct that might be misconduct but was automatically deemed nonprejudicial because of the open-the-door rule.

After the decision in *McKinney*, this court modified the test to be applied when analyzing whether prosecutorial misconduct was harmless, articulating the three-part test that includes the gross and flagrant and ill will factors. *Tosh*, 278 Kan. at 93. After *Tosh*, in at least one case, *State v. Murray*, 285 Kan. 503, 517, 174 P.3d 407 (2008), we carried forward the *McKinney* holding, stating that "no prejudicial error occurs—including prosecutorial misconduct—where the questionable statements are provoked and made in response to prior arguments or statements by defense counsel." For support, the *Murray* court cited another post-*Tosh* case that had

also cited *McKinney, State v. Elnicki*, 279 Kan. 47, 64, 105 P.3d 1222 (2005). The *Murray* court failed to note, however, that the analysis in *Elnicki* departed from *McKinney*. Although the *Elnicki* court did not explicitly overrule *McKinney*, it did so implicitly.

In *Elnicki*, during the rebuttal portion of the State's closing argument the prosecutor commented on the credibility of the victim, telling the jury, " '[Y]ou know she was telling you the truth.' " Noting that this statement was in response to defense counsel's argument that the victim was lying, the *Elnicki* court quoted *McKinney* and then stated: "While the prosecutor's comments here about [the witness' credibility] are not necessarily prejudicial, they are nevertheless error." *Elnicki*, 279 Kan. at 64.

To the extent the *Elnicki* court held the improper comments regarding the witness' credibility were erroneous, even though they were in response to defense counsel's arguments, the holding is consistent with *Manning*. Because there may be confusion about this in light of the statement in *Murray* or similar statements in past cases, today, we reaffirm that a prosecutor commits misconduct by making an improper argument, even if the improper argument is made in response to arguments or statements by defense counsel. The open-the-door rule does not insulate a prosecutor from a finding of misconduct.

Regarding the prejudicial nature of the misconduct, the statement in *Elnicki* was equivocal in that the court noted the prosecutor's misconduct was not *necessarily* prejudicial. Further, in applying the *Tosh* three-part harmlessness test, the *Elnicki* court considered the prosecutor's statements regarding the victim's truthfulness along with the prosecutor's statements that Elnicki's version of events was a "fabrication" and "yarn." Ultimately, the *Elnicki* court concluded the prosecutor's positive comments about the victim's credibility—the statements that might have been excused as nonprejudicial under the *McKinney* open-the-door rule— and the prosecutor's negative statements about Elnicki's credibility were prejudicial and required reversal of the conviction. *Elnicki*, 279 Kan. at 67. Hence, the *Elnicki* court's treatment of the prosecutor's misconduct was inconsistent with the statement in *Murray* that "no prejudicial error occurs" if misconduct is committed in

response to defense counsel opening the door. See *Murray*, 285 Kan. at 517.

We conclude the absolute statement in *Murray* is not supported by *Elnicki*, the case on which it is based. Also, we conclude that the statement in *Murray* is overly broad. Instead of applying the broad and absolute statement found in *Murray*, we hold that a prosecutor's improper comment or argument can be prejudicial, even if the misconduct was extemporaneous and made under the stress of rebutting arguments made by defense counsel. The extemporaneous, rebuttal nature of a prosecutor's argument is merely a factor to be considered by an appellate court.

In considering the first prejudice prong regarding whether a prosecutor's misconduct was gross and flagrant, there are several other factors to be considered. In many cases we have stressed that "appellate courts should look to whether the prosecutor 'repeated or emphasized the conduct.' " *Inkelaar*, 293 Kan. at 430; see, *e.g.*, *State v. Simmons*, 292 Kan. 406, 417-18, 254 P.3d 97 (2011) (finding the prosecution's multiple references to Stockholm Syndrome [not in evidence] and providing the jury with cases illustrating the syndrome was gross and flagrant conduct). Other factors include those discussed in *State v. Kemble*, 291 Kan. 109, 121-25, 238 P.3d 251 (2010). In that case, we considered that the prosecutor commented on the defendant's post-*Miranda* silence during closing argument and did so in a calculated manner as evidenced by the fact the comment was included on a PowerPoint slide shown to the jury; we noted it was significant that the statements were not a "spur-of-the-moment comment delivered extemporaneously under the stress of countering a defense argument." In addition, we noted that the prosecutor violated a long-established, unequivocal rule that was designed to protect a constitutional right. *Kemble*, 291 Kan. at 124.

Here, as stressed by Marshall, three of these factors apply to the prosecutor's statements about Huckabee's honest nature. First, the prosecutor made two references to Huckabee's honesty. Second, the comments violated a long-standing rule prohibiting a prosecutor from vouching for a witness. Third, our caselaw has been clear in stating this rule. On the other hand, as we have noted, the

comments do not appear to be calculated as they were spur-of-the moment rebuttal comments. Furthermore, we hesitate to label the comments as gross and flagrant when we have not analyzed whether the statements were outside the wide latitude allowed a prosecutor but have conducted our analysis based on the State's concession. See *Wolfe Electric, Inc. v. Duckworth*, 293 Kan. 375, 400, 266 P.3d 516 (2011) (generally questions of law must be determined by the court, unlimited by agreement of the litigants; their stipulations as to the law are ineffective to bind the court). We would engage in a more rigorous analysis of both the misconduct and the gross and flagrant prong of the test if we found either of the other factors—ill will or prejudice—weighed in Marshall's favor. But we do not.

In determining if a prosecutor acted with ill will, an appellate court typically examines several factors, including whether the conduct was deliberate, repeated, or in apparent indifference to a court's ruling. *Inkelaar*, 293 Kan. at 430; see, *e.g.*, *State v. Simmons*, 292 Kan. 406, 418, 254 P.3d 97 (2011). In evaluating whether a prosecutor's conduct was deliberate and demonstrated an indifference to prior rulings, it is appropriate to consider the balance between the reality of a trial and the special duties imposed on a prosecutor.

As a trial unfolds and a prosecutor extemporaneously responds to testimony or opposing counsel's arguments, the reality of trial means a prosecutor's statements and questions are not always precisely phrased. Often, if time allowed reflection, a prosecutor could assure that any argument regarding a point affecting a witness' credibility would be phrased appropriately. See *Pabst*, 268 Kan. at 507 ("When a case develops that turns on which of two conflicting stories is true, it may be reasonable to argue, based on evidence, that certain testimony is not believable."). Hence, the spur-of-the-moment nature of a prosecutor's comment delivered extemporaneously under the stress of rebutting a defense argument is a mitigating factor countering a conclusion that a prosecutor acted with ill will.

Yet, any leniency allowed because of the rebuttal nature of the argument must be limited by a prosecutor's duties. These duties were explained by the United States Supreme Court:

"The [prosecutor] is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor—indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one." *Berger v. United States*, 295 U.S. 78, 88, 55 S. Ct. 629, 79 L. Ed. 1314 (1935).

See KRPC 3.8 (special duties of a prosecutor).

In light of these special duties, a prosecutor needs to proceed with caution when making an argument that touches on a topic governed by a clear and long-standing rule.

In this case, the prosecutor's comments regarding Huckabee's honesty appear to be imprecise, spur-of-the-moment comments delivered extemporaneously under the stress of countering a defense argument rather than ones that were deliberately intended. Even though there were two such comments in a short span, there were no other similar comments in either the prosecutor's first argument or other parts of the rebuttal argument.

Moreover, the two comments on which Marshall focuses were embedded in a lengthy argument regarding the evidentiary and common-sense reasons the jury could view the eyewitness identification as credible. To this extent, the overall argument was not unlike those in several cases in which this court has determined a prosecutor did not commit misconduct when arguing a witness was "credible" or that a witness should be "believed" because those arguments were based on a reasonable inference from the evidence presented at trial. See, *e.g.*, *State v. Chanthaseng*, 293 Kan. 140, 148, 261 P.3d 889 (2011) (finding prosecutor's statements about the witness' credibility were accompanied by a discussion of evidence presented at trial, thus the prosecutor was merely asking the jury to draw permissible inferences from the evidence); *State v. Duong*, 292 Kan. 824, 830-32, 257 P.3d 309 (2011) (held prosecutor's statements about the victim's credibility were not prosecutorial misconduct because the prosecutor drew reasonable in-

ferences based on the evidence and was merely directing the jury to specific testimony); *State v. Scott*, 286 Kan. 54, 83, 183 P.3d 801 (2008) ("It is improper for a prosecutor to 'vouch' for the credibility of a witness," but "it is not improper for a prosecutor to argue that of two conflicting versions of an event, one version is more likely to be credible based on the evidence."); *State v. Davis*, 275 Kan. 107, 121-23, 61 P.3d 701 (2003) (holding prosecutor's statement that the victim "should be believed" was based on evidence and was not vouching for the witness, thus the prosecutor was within the latitude afforded).

Given the entire context of the closing argument and the prosecutor's apparent purpose of asking the jury to consider the evidentiary and common-sense reasons to consider the identification credible, we conclude the prosecutor's comments were not motivated by ill will.

Next, we turn to the third factor: Was the evidence of such a direct and overwhelming nature that the misconduct would likely have had little weight in the minds of jurors? In answering this question, the State, as the party benefitting "from the prosecutorial misconduct, bears the burden to establish beyond a reasonable doubt that the error did not affect the defendant's substantial rights, *i.e.*, there is no reasonable possibility the error affected the verdict." *Inkelaar*, 293 Kan. at 431; see, *e.g.*, *State v. Raskie*, 293 Kan. 906, 918, 269 P.3d 1268 (2012) (finding prosecutor's misstatement did not affect the outcome of the trial in light of the entire record).

Here, Huckabee's identification of Marshall was crucial to the State's case. Defense counsel presented the jury with an argument that cast doubt on the credibility of Huckabee's testimony. The State responded with an argument pointing out several reasonable inferences that were drawn from the evidence, as well as ways in which common sense suggested the eyewitness' identification could be believed. Consequently, a reasonable juror could have independently found Huckabee credible. In addition, some physical evidence linked Marshall to the crime; specifically, the pattern on the soles of Marshall's boots appeared to match the footprint on the shed door. Finally, we have recognized flight as a circum-

stance from which guilt can be inferred. See *State v. Walker*, 226 Kan. 20, 21-22, 595 P.2d 1098 (1979). Considering the prosecutor's statements in light of the circumstances and the entire record, we conclude there is no reasonable possibility the prosecutor's statements affected the verdict in this case.

Thus, the prosecutor's statements did not deny Marshall a fair trial.

### EYEWITNESS DEGREE OF CERTAINTY INSTRUCTION

Marshall's second argument on appeal is that the trial court erred in instructing the jury on eyewitness identification using a pattern instruction, PIK Crim. 3d 52.20. Marshall contends this pattern instruction includes a factor that is no longer relevant in light of *State v. Hunt*, 275 Kan. 811, 69 P.3d 571 (2003). The instruction reads:

"The law places the burden upon the State to identify the defendant. The law does not require the defendant to prove he has been wrongly identified. In weighing the reliability of eyewitness identification testimony, you first should determine whether any of the following factors existed and, if so, the extent to which they would affect accuracy of identification by an eyewitness. Factors you may consider are:

"1. The opportunity a witness had to observe. This includes any physical condition which could affect the ability of the witness to observe, the length of the time of observation, and any limitations on observation like an obstruction or poor lighting;

"2. The emotional state of the witness at the time, including that which might be caused by the use of a weapon or a threat of violence;

"3. Whether the witness had observed the defendant on earlier occasions;

"4. Whether a significant amount of time elapsed between the crime charged and any later identification;

"5. Whether the witness ever failed to identify the defendant or made any inconsistent identification;

"6. The degree of certainty demonstrated by the witness at the time of any identification of the accused; and

"7. Whether there are any other circumstances that may have affected the accuracy of the eyewitness identification."

It is the sixth factor—the witness' degree of certainty—that is the focus of Marshall's argument.

As of the time of the Court of Appeals' decision in this case, this court had noted, but left unanswered, the question of whether the

degree of certainty factor should be included in the eyewitness instruction. In *State v. Reid*, 286 Kan. 494, 514-18, 186 P.3d 713 (2008), we had noted the tension between *State v. Trammell*, 278 Kan. 265, 92 P.3d 1101 (2004), which the *Reid* prosecutor argued approved using certainty as a factor, and *Hunt*, 275 Kan. 811, which Reid argued disapproved using certainty as a factor. The Court of Appeals, in its decision in this case, noted this uncertainty and observed that the question might be answered in "*State v. Mitchell*, No. 99,163, unpublished opinion filed February 6, 2009, in which our Supreme Court has granted a petition for review of the same issue advanced by the defendant in this case." *State v. Marshall*, No. 101,641, 2010 WL 481276, at *9 (Kan. App. 2010) (unpublished opinion).

As the Court of Appeals predicted, we did answer the question in our recent decision in *State v. Mitchell*, 294 Kan. 469, 275 P.3d 905 (2012), and another·decision filed the same day, *State v. Anderson*, 294 Kan. 450, 276 P.3d 200 (2012).

In *Mitchell*, the leading case, we synthesized prior caselaw concerning both suppression of eyewitness testimony and the eyewitness identification jury instruction. *Mitchell*, 294 Kan. at 474-75, 476-78. In addition, we considered scientific studies regarding the degree of certainty and its correlation to accuracy. *Mitchell*, 294 Kan. at 479-81. Based on these cases and studies, we reaffirmed that a trial court is required to issue a cautionary instruction when an eyewitness' identification testimony is critical to the prosecution's case, but we disapproved of including the degree of certainty factor in the jury instruction. See *Mitchell*, 294 Kan. at 474-81.

Regarding the degree of certainty factor, the *Mitchell* court held:

"[T]he current language in PIK Crim. 3d 52.20 encourages jurors to give more weight to identifications by a certain witness than an uncertain one and does nothing to inform the jury that certainty evidence may be unreliable. The instruction directs jurors to consider whether a witness has expressed a degree of certainty about the identification and, if so, the extent to which that factor would affect accuracy of the identification. As worded, this factor prompts the jury to conclude that an eyewitness identification is more reliable when the witness expresses greater certainty, which places undue weight on eyewitness certainty evidence. Therefore, we hold it is error to instruct the jury on the degree of certainty factor, and we discourage its further use." *Mitchell*, 294 Kan. at 481.

Under this holding, a trial court errs by instructing the jury on the reliability of eyewitness identification by using PIK Crim. 3d 52.20 without omitting the degree of certainty factor. Although this point was not settled at the time of Marshall's trial, the same reasons that existed for finding error in *Mitchell* and *Anderson* apply in this case. Hence, we conclude the trial court erred in including the degree of certainty factor when instructing Marshall's jury on eyewitness identification.

Next, we turn to whether this error requires us to reverse Marshall's convictions. In this regard, Marshall has a steeper hill to climb than did either Mitchell or Anderson, both of whom had objected at trial to their jury being told that degree of certainty could be considered. Therefore, in those cases, this court reviewed the instruction on appeal to determine "whether it properly and fairly stated the law as applied to the facts and *could* not have reasonably misled the jury." (Emphasis added.) *Mitchell*, 294 Kan. at 476; *Anderson*, 294 Kan. at 457. We concluded neither Mitchell's nor Anderson's jury *could* have been reasonably misled by the error.

Marshall, because he did not object, must establish that the jury instruction was clearly erroneous before this court can reverse his conviction. See K.S.A. 22-3414(3) ("No party may assign as error the giving or failure to give an instruction, including a lesser included crime instruction, unless the party objects thereto before the jury retires to consider its verdict stating distinctly the matter to which the party objects and the grounds of the objection unless the instruction or the failure to give an instruction is clearly erroneous."). "An instruction is clearly erroneous only if the reviewing court reaches a firm conviction that absent the alleged error there was a real possibility the jury *would* have returned a different verdict." (Emphasis added.) *State v. Washington*, 293 Kan. 732, 740, 268 P.3d 475 (2012).

Even though Marshall faces a higher burden of persuasion than did Mitchell and Anderson, the same considerations apply to a determination of whether the eyewitness instruction affected the verdict. In *Mitchell* and *Anderson*, we began the analysis with two initial inquiries: (1) Was the identification crucial to the State's

case? and (2) Was there an opinion of certainty stated? Under the standard that applied in *Mitchell* and *Anderson*, if the answer to either of these questions had been "no," no further analysis would have been necessary because a jury could not have been misled by the instruction that included a degree of certainty factor. Likewise, applying the clearly erroneous standard in this case, if the answer to either question is "no," then the inclusion of the degree of certainty factor *would not* have actually affected the verdict.

In this case, however, the answer to both questions is "yes." As to the first question, the State's case on the burglary and criminal damage to property charges rested almost entirely on Huckabee's identification of Marshall. As to the second question, although Huckabee never volunteered an actual degree of certainty in his identification, he was asked, "Are you certain it's the same person you had seen coming out of the garage?" He answered, "Yes." He was also asked if "there [is] any doubt in your mind that Mr. Marshall was the same person you saw every time." He answered, "No." These and similar questions and answers communicated a level of certainty.

Because the answers to the two initial questions are "yes," we must consider the impact of the jury instruction in light of the entire record and additional considerations. See *Anderson*, 294 Kan. at 458 (citing *Mitchell*, 294 Kan. 469, Syl. ¶ 5). Marshall argues the test for this analysis was stated in *State v. Corbett*, 281 Kan. 294, 305, 130 P.3d 1179 (2006). In *Corbett*, this court analyzed whether an impermissibly suggestive eyewitness identification procedure led to a substantial likelihood of misidentification. That analysis considered the same factors as were given to the jury in this case as part of the eyewitness identification instruction.

In *Mitchell*, however, we concluded the *Corbett* factors are more appropriately applicable to a jury's consideration of reliability than to an appellate court's analysis of whether the error resulted in prejudice. Instead, we held the appropriate appellate consideration is whether "other procedural safeguards mitigated" the deficiency in the eyewitness instruction. *Mitchell*, 294 Kan. at 482-83. In *Mitchell*, we cited to the United States Supreme Court's recent

discussion of these safeguards in *Perry v. New Hampshire*, 565 U.S. ___, 132 S. Ct. 716, 181 L. Ed. 2d 694 (2012).

In *Perry*, the defendant sought to suppress an out-of-court identification on the grounds it was so unreliable and suggestive it violated due process. The Supreme Court refused to recognize a due process violation, concluding, in part, that there are

"safeguards built into our adversary system that caution juries against placing undue weight on eyewitness testimony of questionable reliability. These protections include the defendant's Sixth Amendment right to confront the eyewitness. [Citation omitted.] Another is the defendant's right to the effective assistance of an attorney, who can expose the flaws in the eyewitness' testimony during cross-examination and focus the jury's attention on the fallibility of such testimony during opening and closing arguments. Eyewitness-specific jury instructions, which many federal and state courts have adopted, likewise warn the jury to take care in appraising identification evidence. [Citations omitted.] The constitutional requirement that the government prove the defendant's guilt beyond a reasonable doubt also impedes convictions based on dubious identification evidence." *Perry*, 132 S. Ct. at 728-29.

In considering the *Perry* safeguards as they apply to the facts of this case, we conclude the safeguards counteracted the error of allowing the jury to consider the degree of certainty as a factor in determining the reliability of Huckabee's eyewitness identification of Marshall. Marshall confronted Huckabee, and defense counsel rigorously cross-examined Huckabee about inconsistencies in his descriptions and identifications. Moreover, in closing argument, defense counsel methodically reminded the jury of all the inconsistencies and warned the jury of the risk of a wrongful conviction based on misidentification. Defense counsel also hammered the point that the jury could not convict Marshall unless it was convinced beyond a reasonable doubt that Marshall was guilty. And, defense counsel walked the jury through the factors identified in the eyewitness identification instruction, pointing out reasons the factors suggested Huckabee's identification of Marshall was not reliable.

In doing so, defense counsel suggested Huckabee's assertion that he was certain of the identification belied his credibility. A credible witness, according to defense counsel, would not suggest certainty when the witness failed to observe details and testified

contrary to the facts established by other evidence. How could Huckabee assert certainty when he did not keep constant sight of Marshall and mistakenly identified a woman as Marshall? Defense counsel also asked the jury to consider the mysterious black cases that Huckabee claimed he saw Marshall carrying out of the shed. Defense counsel pointed out that Mosher found nothing missing from the shed and the black cases were never found. In other words, defense counsel used Huckabee's certainty as a sword to show his lack of willingness to recognize discrepancies and suggested a juror could infer from that a lack of credibility.

Finally, we note that although Huckabee's identification of Marshall was the strongest evidence linking Marshall to the crime, it was not the only evidence. As previously discussed, evidence was presented of a footprint on the shed door that appeared to match the pattern of Marshall's boots, and the jury could infer his flight from officers was motivated by a consciousness of guilt.

Thus, the jury was exposed to the facts and circumstances both in favor and against the accuracy of Huckabee's identification. We conclude there is no real possibility the jury would have rendered a different verdict even if the degree of certainty factor had been omitted from the eyewitness jury instruction.

Judgment of the Court of Appeals is affirmed. Judgment of the district court is affirmed.