No. 103,820

STATE OF KANSAS, *Appellee*, v. DONNELL A. DOBBS, *Appellant*.

(308 P.3d 1258)

Opinion filed September 20, 2013.

*Matthew J. Edge*, of Kansas Appellate Defender Office, argued the cause and was on the brief for appellant.

*Jennifer L. Myers*, assistant district attorney, argued the cause, and *Jerome A. Gorman*, district attorney, and *Derek Schmidt*, attorney general, were with her on the brief for appellee.

The opinion of the court was delivered by

MORITZ, J.: Donnell Dobbs directly appeals his conviction of first-degree premeditated murder, attempted first-degree premeditated murder, and criminal possession of a firearm. Dobbs contends the district court violated his statutory right to a speedy trial in granting the State's request for a continuance. Dobbs also argues he is entitled to a new trial because the district court gave a clearly erroneous eyewitness identification instruction. We reject both of Dobbs' claims and affirm his convictions.

FACTUAL AND PROCEDURAL BACKGROUND

In 2008, Dobbs walked into TJ's Barbershop at the intersection of 13th Street and Washington Boulevard in Kansas City, Kansas, with an assault rifle and opened fire. Three men inside the shop ran out the front door and into a nearby wooded area as Dobbs followed his apparent targets, Muryel Josenberger and Mario Mitchell, out the back door.

Dobbs shot both men, killing Josenberger and severely wounding Mitchell, then left the scene in a gray or silver Monte Carlo driven by a second man. Mitchell told the first police officer who arrived after the shooting that two unknown black men walked into the shop and began shooting. Mitchell was transported to Truman Medical Center where he was treated for 12 gunshot wounds and remained for about 1 month.

Twelve days after the shooting, Mitchell identified Dobbs as the gunman and Casey Ellis as the driver of the getaway car. Two days later, the State filed a joint complaint charging Dobbs and Ellis with first-degree premeditated murder and attempted first-degree premeditated murder and additionally charging Dobbs with criminal possession of a firearm. The following facts were developed at Dobbs and Ellis' joint trial.

The barbershop's owner, Anthony Jackson, testified that on the day of the shooting, he was facing the back of the shop when he heard Mitchell say, " '[O]h shit,' " and saw him run toward the back door. Jackson turned around and saw a man with an assault rifle come through the front door and move toward the back of the shop. Another barber at the shop, Damon Campbell, also saw a man walk into the shop with a "long gun."

Jackson and Campbell testified they ran out the front door of the shop and into a nearby wooded area as the gunman moved toward the back of the shop and began shooting. At some point, Jackson heard the sounds of screeching tires and a fast-moving vehicle. When Jackson and Campbell returned to the shop, they could see that Josenberger and Mitchell had been shot and were lying on the ground outside the back door.

Jackson and Campbell both testified the gunman wore a hat and had a bandana or scarf over his face covering the area under the

gunman's eyes. Jackson did not recall the color of the hat or scarf, but Campbell testified they were both blue. Sometime after the shooting, Jackson and Campbell each viewed several photographs of potential suspects, but neither man could identify the gunman.

Diana Union testified she was driving toward the intersection of 13th Street and Washington Boulevard when she saw two men running into a wooded area to the west of TJ's Barbershop. As Union approached the barbershop parking lot, a gray Monte Carlo exiting the parking lot nearly collided with Union's vehicle. Union could see a man holding a gun out the passenger-side window. Union described the gun as black with "holes in it around the barrel part of it . . . [t]he way machine guns look." Union stopped at a nearby friend's home where her friend called 911 and reported the incident.

Bobbie Montiel testified she was in her front yard near 14th Street and Washington Boulevard when she heard screaming and gunshots. Montiel grabbed her children and ran to the side of her house where she watched "a silver Impala looking car" or Monte Carlo going westbound on Washington. Montiel heard between 12 and 15 gunshots and assumed the gunfire originated from the silver car because the passenger door was open as the car drove by. Montiel saw two black men inside the car, but she could not identify either man. Montiel immediately called 911.

The first officer to respond, Officer Glenn Jay Carter, found Mitchell and Josenberger lying on the ground outside the barbershop. Josenberger was dead and Mitchell was screaming. In response to questioning from Carter, Mitchell said he was getting a haircut when two guys came in and started shooting. However, Mitchell told Carter he did not know who shot him. According to Carter, Mitchell was coherent but was primarily concerned with getting medical attention.

Mitchell testified at trial regarding his prior relationship with Dobbs and his recollection of the shooting and events following the shooting. Mitchell, who was 23 years old at the time of trial in 2009, testified he went to high school with Dobbs and Ellis and had known them since the ninth or tenth grade. Mitchell identified

both defendants in the courtroom and said he had been "cool" with Ellis in high school until Ellis began a friendship with Dobbs.

Mitchell testified he was sitting in a chair at TJ's Barbershop getting a haircut when he saw Dobbs walk through the door. Mitchell testified Dobbs wore a hat on his head and a bandana on his face and Mitchell could see only the space around his eyes. Mitchell could not recall the color of the hat or the bandana, nor could he recall the clothing worn by Dobbs. According to Mitchell, Dobbs carried some kind of assault rifle, probably an AK-47 or AR-15.

Upon seeing the gun, Mitchell took off running and told Josenberger to run. Mitchell followed Josenberger out the back door of the barbershop. Mitchell heard 12 or 13 shots and was shot at least once before stumbling out the door. Outside, Mitchell saw Josenberger lying on the ground and ran past his body before being "shot some more" and falling to the ground.

Dobbs then approached Mitchell, stood over him, and attempted to shoot him again. Mitchell heard a "click, click, click," and he assumed Dobbs' gun was empty. Mitchell testified that by that point, the bandana had fallen from Dobbs' face and Mitchell got a good look at Dobbs as he stood over him. Mitchell testified he had "[n]o doubt" that Dobbs was the gunman.

After Mitchell heard the gun click, he closed his eyes so Dobbs would believe he was dead. When Dobbs ran off, Mitchell opened his eyes and saw Dobbs get into a Monte Carlo that Mitchell recognized as belonging to Dobbs' brother. Mitchell could see Casey Ellis driving the Monte Carlo, and he watched it go west on Washington Boulevard.

Mitchell recalled talking to an officer about 5 minutes after the Monte Carlo drove off and asking for an ambulance. However, he could not recall telling the officer that two men entered the shop and started shooting. Mitchell also testified he identified Dobbs and Ellis from two separate photo lineups during a subsequent interview with detectives.

On cross-examination, defense counsel attempted to impeach Mitchell's identification of Dobbs and Ellis, pointing out that Mitchell made various statements to detectives explaining how he

had been able to identify Dobbs and that he used uncertain language in his identifications, including indicating the gunman "looked like" Dobbs. Defense counsel also emphasized that Mitchell made inconsistent statements regarding whether Dobbs wore a hat on the day of the shooting and about whether the bandana covered Dobbs' nose. Finally, in response to defense counsel's questioning regarding prior convictions involving truth or veracity, Mitchell conceded he had two juvenile adjudications, one for burglary and one for theft.

On redirect, Mitchell clarified that although he used various statements to describe how he knew or recognized Dobbs and Ellis, he did not intend to imply that he was uncertain about his identification of either defendant.

Claude Harper, a crime scene investigator, processed and videotaped the crime scene, took photographs, and collected evidence. Harper identified a photograph of a blood smear on the sidewalk in front of the barbershop and two swabs taken from that blood smear. Harper also identified other evidence found at the scene, including a bloody earring, several fired cartridges, a bullet fragment, and a live .223 caliber Remington PMC cartridge. Harper testified that based on his training and experience, all of the cartridges discovered at the scene were consistent with ammunition used in a military-type rifle such as an AR-15 or M-16.

Detective Bryan Block testified he obtained DNA samples from Dobbs, Mitchell, and Josenberger, but that testing of the samples did not link Dobbs to the crime scene. Testing revealed that Mitchell's blood matched the blood smear on the sidewalk in front of the barbershop and the blood on the earring found at the scene.

Based on witness reports, Block located the vehicle used in the homicide and identified the owner of the vehicle as Dobbs' brother, Dion Dobbs. Block testified officers found some type of "magazine pouch" in the Monte Carlo and that the pouch could be used to hold a gun magazine.

Block interviewed Mitchell at the hospital 12 days after the shooting. According to Block, although Mitchell was in pain and on medication, he was coherent and able to talk. During the in-

terview, Mitchell identified Dobbs as the gunman and Ellis as the driver, and he seemed certain about both identifications.

Regarding the firearm charge, Dobbs stipulated he had a prior felony conviction and was prohibited from possessing a firearm on the date of the shooting.

During the instruction conference, the State objected to the eyewitness identification instruction, arguing it was unnecessary and inappropriate because Mitchell knew both defendants. The court disagreed, reasoning that Mitchell initially told police he did not know the men involved in the shooting. The court asked defense counsel for any comments, additions, or deletions to the instructions, to which defense counsel responded: "We're satisfied with these instructions."

During closing arguments, the prosecutor acknowledged that identity was a disputed issue. She also reminded the jury that Mitchell was the only person who had the opportunity to see Dobbs' face and that Mitchell knew both defendants from high school. Finally, the prosecutor pointed out that other witnesses corroborated various aspects of Mitchell's testimony.

Counsel for both defendants emphasized in closing arguments that Mitchell was the only person who identified the defendants, pointed out inconsistencies in Mitchell's testimony, and challenged Mitchell's credibility. Ellis' counsel specifically reminded the jury of the factors identified in the eyewitness identification instruction.

In rebuttal, the prosecutor reminded the jury that Detective Block testified Mitchell seemed certain in his identification of the defendants. The prosecutor cautioned the jury against singling out the eyewitness identification instruction and urged them instead to read all of the instructions together. The prosecutor noted, again, that Mitchell had known both defendants for years, and argued this case presented a "different situation" than those in which a witness identified a stranger.

At some point after deliberations began, the jury asked: "What is 'Truth & Veracity'? How is it different from purgery [*sic*]?" The court responded by asking the jury to be more specific, and the jury then explained: "We were told that [Mitchell] had been convicted with counts against him of 'truth and verasity [*sic*].' This

could help us understand the character of the witness if we could better understand this conviction." After consultation with all parties, the court called the jurors into the courtroom and advised as follows: "[Mitchell] was convicted as a juvenile of burglary in 2000 and misdemeanor theft in 2001."

Ultimately, the jury acquitted Ellis of all charges but found Dobbs guilty of first-degree premeditated murder, attempted first-degree premeditated murder, and criminal possession of a firearm. At sentencing, the district court denied Dobbs' motion for a new trial and imposed a sentence of life imprisonment without the possibility of parole for 25 years for the first-degree murder conviction and a consecutive controlling prison sentence of 155 months for the other two convictions.

Our jurisdiction over Dobbs' direct appeal arises under K.S.A. 22-3601(b)(1) (maximum sentence of life imprisonment and conviction of off-grid crime).

## Discussion

*The district court did not abuse its discretion in granting the State's request for a continuance under K.S.A. 22-3402(5)(c).*

Dobbs claims the district court abused its discretion in granting the State's request for a continuance under K.S.A. 22-3402(5)(c) to obtain reports from the KBI regarding several pieces of evidence submitted for forensic analysis. Dobbs argues the delay caused by the improper continuance resulted in a violation of his statutory right to a speedy trial, and he seeks discharge from liability for his crimes under K.S.A. 22-3402(1).

### Standard of Review

When reviewing a district court's decision to grant a continuance under K.S.A. 22-3402(5), we apply the abuse of discretion standard. *State v. Beaman*, 295 Kan. 853, 862-63, 286 P.3d 876 (2012); *State v. Cook*, 281 Kan. 961, 986, 135 P.3d 1147 (2006). A judicial action constitutes an abuse of discretion if the action (1) is arbitrary, fanciful, or unreasonable; (2) is based on an error of law; or (3) is based on an error of fact. *State v. Ward*, 292 Kan. 541, 550, 256 P.3d 801 (2011), *cert. denied* 132 S. Ct. 1594 (2012). Dobbs bears

the burden of establishing that an abuse of discretion occurred. See *State v. McCullough*, 293 Kan. 970, 996, 270 P.3d 1142 (2012).

*Analysis*

The State has a statutory duty to bring a defendant to trial within 90 days of arraignment if the defendant is being held in custody solely on the charges related to the trial. K.S.A. 22-3402(1); *State v. Breedlove*, 295 Kan. 481, 486, 286 P.3d 1123 (2012). If the State fails to bring the defendant to trial within the 90-day period, the defendant may be entitled to be discharged from liability for the crimes charged. K.S.A. 22-3402(1).

But delays attributable to court-ordered continuances authorized under K.S.A. 22-3402(5) are not counted against the State in computing the 90-day period. K.S.A. 22-3402(1); *State v. Edwards*, 291 Kan. 532, 538, 243 P.3d 683 (2010); *State v. Hines*, 269 Kan. 698, 703, 7 P.3d 1237 (2000). A district court may grant a continuance if (1) material evidence is unavailable, (2) reasonable efforts have been made to procure that evidence, and (3) reasonable grounds exist to believe the evidence can be obtained and trial can begin within the succeeding 90 days. K.S.A. 22-3402(5)(c).

Dobbs was arraigned on January 13, 2009, and his trial was scheduled for April 6, 2009. In March 2009, the State filed a written motion for a continuance under K.S.A. 22-3402(5)(c). The State indicated it had submitted "physical evidence" to the KBI in October 2008 for DNA, firearm, and toolmark analysis, but the testing would not be completed for at least 30-60 days due to a KBI lab backlog. Further, the State alleged reasonable grounds existed to believe the evidence would be available within the next 90 days.

At the March 31, 2009, hearing on the State's motion, David Morales, an investigator from the district attorney's office, testified about the KBI's backlog of cases requiring laboratory testing and indicated the prosecution had submitted the evidence in this case to the KBI in October 2008. Morales testified he had spoken with Barbara Crim-Swanson at the KBI regarding the status of the testing in this case and had learned that the testing should be completed within the next 60 days.

Following Morales' testimony, the prosecutor asserted the unavailable evidence was "material," arguing:

"[T]he evidence that we're talking about consists of in excess of 40 shell casings from the scene, some physical evidence that—that could be connected to one of the defendants, including an earring and a pouch—I want to say a pouch. I'm not entirely sure if that's a correct description. But this other—this is all physical evidence from the scene. It's material both to the identity—excuse me—of the shooter as well as to the manner of death of Muryel Josenberger and the cause of the injuries to Mario Mitchell."

Defense counsel objected to the continuance, noting Dobbs had been in custody for over 5 months, and urged the court to reconsider the amount of Dobbs' bond if it granted the continuance. The court granted the continuance, stating:

"[T]he State has presented a case that appears to match the requirements of the K.S.A. 22-3402 Subsection 5(c). This is material evidence which is unavailable. Reasonable efforts have been made to procure such evidence. There [are] reasonable grounds to believe the evidence can be obtained [and] trial commenced within the next succeeding 90 days.

"Based upon that and the testimony of the investigator, the State's motion to continue the matter is granted. You've got 90 days, but the condition is that as soon as you obtain the material, you notify the parties and the Court and we'll see if we could get these fellows scheduled . . . as soon as possible . . . within the 90 days."

Only 77 days elapsed from Dobbs' arraignment to the district court's decision to grant the continuance. An 83-day delay resulted from the continuance, and Dobbs' trial commenced 160 days after arraignment.

On appeal, Dobbs argues the district court abused its discretion in granting the continuance because the State failed to establish the materiality of the evidence at issue and, consequently, the continuance violated his statutory right to a speedy trial. Specifically, Dobbs argues (1) Morales referred only to DNA testing and not to the testing of the shell casings; therefore, the State failed to prove the KBI backlog affected the testing of the shell casings, and (2) the State failed to establish the materiality of the earring and magazine pouch, which were subjected to DNA testing, because the prosecution "never explained its basis for connecting these ob-

jects to the gunman, or why these objects might yield DNA evidence that would identify him."

Dobbs relies on *Smith v. Deppish*, 248 Kan. 217, 807 P.2d 144 (1991), and *State v. Brown*, 266 Kan. 563, 973 P.2d 773 (1999), to support his suggestion that the State must establish the materiality of unavailable evidence by demonstrating some connection between the defendant and the evidence submitted for testing before a continuance is warranted under K.S.A. 22-3402(5)(c).

Neither of the cited cases supports Dobbs' position. The primary issue in *Smith* was whether the State made a reasonable effort to timely submit samples for testing. In affirming the trial court's grant of a continuance, the *Smith* court implicitly approved the trial court's reasoning that the continuance should be granted because the tested evidence *could be* material, not because the materiality of the evidence had been conclusively established before the court granted the continuance. See 248 Kan. at 223 (citing trial court's reasoning that "if the evidence was tested, the test results could produce either exculpatory evidence material to the defense or evidence material to the identity of the defendant as the murderer").

Similarly, in *Brown* this court affirmed the trial court's decision to grant a continuance when a connection between the evidence submitted for testing and the victim was possible, but not conclusively established. There, the victim's body had not been recovered, and the State sought a continuance to obtain DNA testing on bone and teeth fragments found in a salvage yard where the victim had purportedly been cremated by the defendant. As in *Smith*, the defendant in *Brown* did not challenge the materiality of the evidence. Yet, in affirming the continuance, the *Brown* court noted the State was "entitled to *attempt to match* the bones and teeth fragments found at the crime scene to the victim's DNA." (Emphasis added.) *Brown*, 266 Kan. at 572. The *Brown* court further noted that the materiality of the evidence "did not change when the testing or lack of it did not result in admissible evidence." 266 Kan. at 571.

We have not previously defined "material evidence" in the context of a continuance under K.S.A. 22-3402(5)(c). See *State v. Jack-*

*son,* 280 Kan. 16, 25, 118 P.3d 1238 (2005) ("We have previously upheld continuances of up to 120 days for DNA testing in murder cases without specifically analyzing whether the DNA evidence was material."), *cert. denied* 546 U.S. 1184 (2006). In other contexts, we have explained that "[m]aterial evidence is evidence that ' "has a legitimate and effective bearing on the decision of the case and is in dispute.' " *State v. Garcia,* 285 Kan. 1, 14, 169 P.3d 1069 (2007)." *State v. Preston,* 294 Kan. 27, 32, 272 P.3d 1275 (2012).

But both *Brown* and *Smith* support the proposition that evidence is "material" for purposes of K.S.A. 22-3402(5)(c) when the evidence *may have* a legitimate and effective bearing on the decision of the case, *i.e.,* when the evidence has the potential to inculpate or exculpate the defendant. See also *Jackson,* 280 Kan. at 25 (rejecting defendant's argument "DNA evidence from the multiple crime scenes" was not sufficiently material to support State's request for continuance under prior version of the statute and reasoning "[e]ven though the DNA evidence did not directly implicate Jackson, it implicated his codefendants and corroborated" other testimony). Consequently, we reject Dobbs' position that the State must demonstrate a definitive connection between the defendant or the victim and the evidence submitted for testing before that evidence can be considered material for purposes of granting a continuance under K.S.A. 22-3402(5)(c).

Here, the record supports the district court's determination that the evidence was material for purposes of granting the continuance. Morales testified that evidence was submitted for DNA testing in October 2008 and would not be tested before trial due to the KBI's backlog. Although Morales offered no specifics about the evidence submitted for testing, the prosecutor informed the court that the evidence consisted of over 40 shell casings, a bloody earring, and some type of pouch. The prosecutor further informed the court that the evidence found at the crime scene could be material to the identity of the gunman and to the manner of death and injury of the victims.

Accordingly, we conclude the district court did not abuse its discretion in granting the continuance under K.S.A. 22-3402(5)(c). Further, because the 83-day delay attributable to the continuance

does not count against the State, the district court did not violate Dobbs' statutory right to a speedy trial, and he is not entitled to a discharge from liability for his crimes under K.S.A. 22-3402(1).

*The district court did not commit clear error in giving the jury an eyewitness identification instruction.*

Consistent with PIK Crim. 3d 52.20, the district court instructed the jury, in relevant part, that "[i]n weighing the reliability of eyewitness identification testimony" the jury should consider "[t]he degree of certainty demonstrated by the witness at the time of any identification of the accused." Dobbs claims he is entitled to a new trial because the district court's instruction on eyewitness identification included the degree of certainty factor that he contends this court disapproved in *State v. Hunt*, 275 Kan. 811, 69 P.3d 571 (2003). The State argues the district court did not err in including the factor in light of *State v. Trammel*, 278 Kan. 265, 269-70, 92 P.3d 1101 (2004).

*Standard of Review*

Because Dobbs failed to object to the instruction, we apply the clear-error rule. See K.S.A. 22-3414(3); *State v. Marshall*, 294 Kan. 850, 867, 281 P.3d 1112 (2012). To determine whether a given instruction was clearly erroneous, we first determine whether the instruction was erroneous. This is a legal question subject to de novo review. If we find error, we then determine whether reversal is required. Reversal is required only if we are firmly convinced the jury would have reached a different verdict absent the error. We have unlimited review over the reversibility determination and, in conducting that review, we examine the entire record as a whole. The defendant bears the burden of establishing clear error under K.S.A. 22-3414(3). *State v. Williams*, 295 Kan. 506, 515-16, 286 P.3d 195 (2012).

*Analysis*

We recently issued two decisions impacting our analysis of the instructional issue in this case: *Marshall*, 294 Kan. 850, and *State v. Mitchell*, 294 Kan. 469, 275 P.3d 905 (2012).

In *Mitchell*, we reaffirmed that a trial court should issue a cautionary eyewitness identification instruction when "an eyewitness identification is a critical part of the prosecution's case and there is [a] serious question about that identification's reliability." *Mitchell*, 294 Kan. at 479. But we also held that it is error to instruct the jury on the degree of certainty factor that is included in PIK Crim. 3d 52.20. See *Mitchell*, 294 Kan. at 481 (concluding instruction, as written, "prompts the jury to conclude that an eyewitness identification is more reliable when the witness expresses greater certainty, which places undue weight on eyewitness certainty evidence"). Thus, the district court erred in instructing the jury on the degree of certainty factor in this case. The only remaining question is whether this error requires reversal.

We begin by considering whether the eyewitness identification was crucial to the State's case and whether the witness stated an opinion of certainty. See *Marshall*, 294 Kan. at 867-68; *Mitchell*, 294 Kan. at 481-83. "[I]f the answer to either question is 'no,' then the inclusion of the degree of certainty factor *would not* have actually affected the verdict," and, accordingly, would not constitute clear error. (Emphasis added.) *Marshall*, 294 Kan. at 868.

If, however, the answer to both questions is yes, the next step is to "consider the impact of the jury instruction in light of the entire record and additional considerations." *Marshall*, 294 Kan. at 868. At this stage, "[t]he appropriate appellate consideration is whether 'other procedural safeguards mitigated' the deficiency in the eyewitness instruction." 294 Kan. at 868.

Those safeguards include, but are not limited to, the defendant's constitutional right to confront the witnesses against him or her; the defendant's constitutional right to effective assistance of counsel " 'who can expose the flaws in the eyewitness' testimony during cross-examination and focus the jury's attention on the fallibility of such testimony during opening and closing arguments' "; eyewitness-specific jury instructions that " 'warn the jury to take care in appraising identification evidence' "; and the constitutional requirement that the State prove every element of the crime beyond a reasonable doubt. *Marshall*, 294 Kan. at 868-69 (quoting *Perry*

*v. New Hampshire*, 565 U.S. ___, 132 S. Ct. 716, 728-29, 181 L. Ed. 2d 694 [2012]).

In this case, the answer to both initial questions is "yes." First, Mitchell's identification of Dobbs was crucial to the State's case because Mitchell was the only witness who identified Dobbs as the gunman and there was no physical evidence placing Dobbs at the crime scene. See *Marshall*, 294 Kan. at 868 (finding witness' identification critical when charges "rested almost entirely on" witness' identification of defendant); *Mitchell*, 294 Kan. at 482 (finding witness' identification critical when it was only evidence connecting defendant to crime). Further, the prosecutor emphasized the importance of Mitchell's testimony in closing argument when she characterized Mitchell as the "star witness" on the issue of identity.

Second, the jury heard both Mitchell and Detective Block express certainty as to Mitchell's identification of Dobbs as the gunman. Mitchell, after being thoroughly cross-examined about discrepancies in his statements, clarified that although he used various statements to describe how he knew or recognized the defendants, he did not intend to imply uncertainty about his identification of either defendant. And Block testified that when he interviewed Mitchell in the hospital, Mitchell expressed no uncertainty in identifying Dobbs as the shooter.

These expressions of certainty may have affected the jury's deliberations. See *Marshall*, 294 Kan. at 868 (citing similar "certainty" testimony presented at the defendant's trial); *Mitchell*, 294 Kan. at 482 (noting that trial evidence indicated witness was "100 percent certain" when he identified defendant from photo lineup).

Because the district court erroneously instructed the jury to consider Mitchell's degree of certainty and because we have affirmatively answered both initial inquiries of our analysis, we next determine whether "other procedural safeguards mitigated any deficiency in the cautionary instruction." *Mitchell*, 294 Kan. at 482; accord *Marshall*, 294 Kan. at 868.

Here, Dobbs fully exercised his right to confront Mitchell at trial, and defense counsel for both defendants thoroughly cross-examined Mitchell about inconsistencies in his descriptions of the gunman and his identification of Dobbs. Ellis' counsel elicited testi-

mony indicating Mitchell had previous "incidents" or "fights" with Dobbs and later argued Mitchell may have implicated Dobbs to "settle old scores." Ellis' counsel also elicited testimony that Mitchell had prior juvenile adjudications for burglary and theft which implicated Mitchell's "truth or veracity."

Further, both counsel utilized closing arguments to remind the jury of inconsistencies and discrepancies in Mitchell's testimony, the factors to consider in weighing the credibility of an eyewitness' identification, and the State's burden of proof. Specifically, Dobbs' counsel suggested Mitchell's identification of Dobbs was suspect because Mitchell initially told police he couldn't identify the shooter but 2 weeks later Mitchell identified the gunman as Dobbs and couched his identification in ambiguous language, *i.e.*, saying the gunman "looked like to me Donnell Dobbs." Similarly, Ellis' counsel emphasized that Mitchell initially told police he could not identify the gunman or the getaway driver but later told detectives Dobbs and Ellis committed the crimes.

Under these unique circumstances, we conclude the procedural safeguards sufficiently counteracted the erroneous instruction. This conclusion seems particularly appropriate here, where Dobbs was not a stranger to Mitchell. As we noted in *Mitchell*, the "normal concerns about eyewitness reliability" may not be present when the witness is personally familiar with the defendant. See *Mitchell*, 294 Kan. at 482 (discussing caselaw suggesting it is unnecessary to give cautionary eyewitness identification instruction when witness is personally familiar with defendant). Here, Mitchell testified he had known Dobbs since high school and that is why Mitchell recognized Dobbs as he stood over him with a gun.

Finally, we note that even though Mitchell's identification of Dobbs was the State's strongest evidence implicating Dobbs, it was not the only evidence. See *Marshall*, 294 Kan. at 870 (noting State's strongest evidence was witness' identification of defendant, but other circumstantial evidence linked defendant to crime). Here, Mitchell identified the getaway car as a gray Monte Carlo he recognized as belonging to Dobbs' brother, Dion. Two other witnesses, Montiel and Union, also testified they saw a gray or silver Monte Carlo or Impala leaving the barbershop after the shooting.

Further, both witnesses identified photographs of Dion's Monte Carlo as the car they saw leaving the barbershop. Finally, Campbell's and Jackson's accounts of the shooting were consistent with Mitchell's trial testimony. All three men testified that a lone gunman wearing a hat and a bandana over his face walked into the barbershop with a "long gun" or assault rifle and began shooting. Thus, as the prosecutor argued, other witnesses corroborated several aspects of Mitchell's testimony.

In conclusion, we hold the trial court erred in giving an eyewitness identification instruction which included the degree of certainty factor disapproved of by this court in *Mitchell*. But other procedural safeguards in this case sufficiently counteracted that instruction. Specifically, through cross-examination and closing argument, the jury was thoroughly exposed to the facts and circumstances both in favor of and against the accuracy of Mitchell's identification of Dobbs as the gunman. See *Marshall*, 294 Kan. at 870; *Mitchell*, 294 Kan. at 483. Further, other witnesses corroborated aspects of Mitchell's testimony.

We conclude under these circumstances that there is no reasonable possibility the jury would have rendered a different verdict absent the error; thus, reversal is not required.

Affirmed.