No. 107,038

STATE OF KANSAS, *Appellee*, v. AARON K. CLAY, *Appellant*.

(329 P.3d 484)

Opinion filed July 25, 2014.

*Carol Longenecker Schmidt*, of Kansas Appellate Defender Office, argued the cause and was on the brief for appellant.

*Ryan W. Walkiewicz*, assistant district attorney, argued the cause, and *Jerome A. Gorman*, district attorney, and *Derek Schmidt*, attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

MORITZ, J.: Aaron K. Clay appeals his jury convictions of felony murder, attempted aggravated robbery, and criminal possession of a firearm. Clay contends the trial court twice erred in instructing the jury, twice erred by responding in writing to jury questions, and erred by permitting the jury to learn he was in custody and had been in prison. Clay also raises three sentencing errors.

We find no trial errors justifying reversal of Clay's convictions. But because the district court improperly sentenced Clay to 25 years to life instead of 20 years to life, we vacate Clay's sentence and remand for resentencing.

## FACTUAL AND PROCEDURAL BACKGROUND

The events leading to Clay's convictions began on January 2, 2010, as a group of people socialized in the apartment of Jose Guadelupe Mayorga-Diaz (Mayorga). The group included Javier Reynoza, Mayorga's friend; Juan Carlos Rios-Patron, who was staying with Mayorga's neighbor; Deliska Tate and Annicka Martinez, Mayorga's acquaintances; Reuban Richardson, who occasionally stayed with Mayorga; Kristy Robinson, Richardson's girlfriend; and Jason Hochard, Richardson's close friend. Tate and Martinez left Mayorga's apartment in the early evening. Hochard, Richardson, and Robinson left sometime later.

Around 10 p.m., someone knocked on the apartment's door. Mayorga asked who it was, and a male voice replied, "Jason." Reynoza opened the door, peeked out, and took two steps backward. The man at the door fired a gun, hitting Reynoza in the forehead. Reynoza later died from the gunshot wound.

*Rios-Patron identifies the shooter.*

Testifying through an interpreter, Rios-Patron said that on the night of the shooting he was at Mayorga's apartment eating, drink-

ing, and socializing. As Rios-Patron sat about 7 to 8 feet from the apartment's door, he heard "Jason" knocking. After Reynoza opened the door, Rios-Patron saw a man fire a gun, hitting Reynoza. Rios-Patron saw the shooter's face and looked into his eyes. Afraid he too would be shot, Rios-Patron laid down on the floor.

Rios-Patron testified that on the night of the shooting he told officers he did not know the shooter. Soon thereafter, law enforcement officers showed Rios-Patron a six-person photographic lineup and asked him if any of the photographs depicted the shooter.

According to Rios-Patron, as officers showed him the photo lineup, they "kind of threaten[ed]" him, saying he needed to cooperate or else he could go to jail. So Rios-Patron selected Richardson from the lineup and told police the photograph "look[ed] like [the shooter] a lot" and that he thought "it may be" the shooter. At trial, Rios-Patron said he picked Richardson because he had seen him around the apartment complex. But according to Rios-Patron, he "had no certainty" Richardson was the shooter and only identified him so police would "leave [Rios-Patron] alone."

A few weeks later police again showed Rios-Patron photographs, this time in an effort to identify another of Mayorga's guests the night of the shooting. Instead, as Rios-Patron testified, "When I saw a photograph, there was a photograph of a face right there. And when I saw it, I just—I just had to look again and went back and said, [o]h. I got surprised. It's like, [t]his is [the shooter]." The prosecutor asked Rios-Patron how "sure" he was that the photograph depicted the shooter, and Rios-Patron responded, "Well, it's the same. It's him." The prosecutor then asked Rios-Patron if the man in the photograph was in the courtroom, and Rios-Patron identified Clay.

On cross-examination, defense counsel asked Rios-Patron if he was afraid of Richardson. After Rios-Patron said he was not, defense counsel impeached him with his preliminary hearing testimony in which Rios-Patron testified he was afraid of Richardson "and his people."

The accounts of the law enforcement officers who were present during Rios-Patron's identifications of Richardson and Clay differed from his. Detective James Gunzenhauser testified Rios-Pa-

tron identified Richardson as the shooter before being shown a lineup. And when Rios-Patron was shown a six-person lineup shortly thereafter, he immediately identified Richardson as the shooter and expressed no uncertainty in his identification. Gunzenhauser denied he or any other officer threatened Rios-Patron.

Detective Angela Garrison testified she showed a second set of photographs to Rios-Patron in an attempt to identify a man named Marcos who reportedly also was at Mayorga's apartment the night of the shooting. As Rios-Patron reviewed the photographs, he "blurted out" that the photograph depicting Clay was the shooter. Rios-Patron appeared confused, however, so Garrison placed Richardson's photo next to Clay's photo and again asked Rios-Patron to identify the shooter. According to Garrison, Rios-Patron initially believed the two pictures showed the same person but then became "adamant" that Clay's photograph depicted the shooter. He then declared he knew "for sure" Clay was the shooter because of his eyes and his mouth.

*The Activities of Tate, Martinez, West, and Clay*

Tate and Earl "Will" West testified that they, along with Martinez and Clay, devised a plan to rob some of the people in Mayorga's apartment on January 2, 2010. Although their testimony contained discrepancies, they generally corroborated each other on the following facts.

Tate testified she and Martinez left Mayorga's apartment around 5 p.m. Clay and West picked up the two women in a dark-colored Jeep. They then stopped at a gas station, and West went inside to pay for gas and buy cigarettes.

While West was inside, Martinez and Clay talked about robbing "the Mexicans" at Mayorga's apartment, one of whom was "flashing around a lot of money." Tate said because she and Martinez knew Hochard and Richardson, they decided that if the two men were at the apartment, "[the robbery] couldn't go down." Tate called Hochard and determined he and Richardson had left Mayorga's apartment.

When West returned, the others told him about their plan to commit the robbery. At Tate and Martinez' direction, West drove

to Mayorga's apartment building and circled the block several times to ensure Richardson's car was not there. Tate testified that before they arrived at the apartment building, Clay pulled out a gun. When Tate expressed concern about the gun, Martinez told her nothing would happen and that, "[i]f anything, they would just shoot off one shot to scare—you know what I'm saying to get everybody in their place." Tate testified it appeared Clay agreed with Martinez' plan. Tate told Clay to use Hochard's first name—Jason—to gain entry into the apartment.

West parked the car, and he and Clay went inside while Martinez and Tate waited in the Jeep. Clay entered the building while West stayed at the bottom of the stairs to watch the front door. West heard Clay knock on a door and then heard a single shot, causing West to run out the door.

According to Tate, after about 5 or 6 minutes, Clay and West emerged from the building and got back in the car. No one spoke as they drove away. At some point, Clay directed the driver, Martinez, to drive to the apartment of Clay's friend, William Sikorski.

At Sikorski's apartment, Clay changed his clothes while Tate, Martinez, and West smoked methamphetamine. About an hour later, the group left Sikorski's apartment; West and Tate then traveled in a maroon car while Clay and Martinez got back in the Jeep. The two cars stopped at a convenience store where Clay filled a gas can. Driving the maroon car, Tate and West continued to follow Clay and Martinez to an open lot near the downtown airport.

West and Tate parked a short distance ahead of Clay and Martinez. West and Tate then saw flames and watched as Clay and Martinez got in the maroon car with them. Clay had burns on his face. A law enforcement officer testified at trial that Tate later led him to the area where the Jeep was burned. There, the officer found a patch of burned grass and recovered a partially melted Jeep emblem as well as other debris from a burned vehicle. The officer also learned that a burned Jeep had been towed from the area.

A day or two later, Clay, Tate, Martinez, and Sikorski heard a news report indicating Reynoza had died as a result of injuries from the shooting. Sikorski testified that during the report, Tate and

Martinez "started acting real frantic." An officer who interviewed Sikorski testified Sikorski told him Clay said, "Fuck, the mother-fucker died," when he heard the report.

## Richardson's Whereabouts

Richardson, Hochard, and Robinson also were at Mayorga's apartment on the night of the shooting. Richardson regularly stayed at Mayorga's and sold drugs with Hochard's assistance.

Richardson, Robinson, and Hochard all testified on behalf of the State, primarily to discredit Rios-Patron's initial identification of Richardson as the shooter. Their testimonies were somewhat inconsistent although they all indicated Richardson was not near the apartment at the time of the shooting.

They testified that at some point in the evening, Mayorga asked Richardson and Robinson to go get beer, cigarettes, and fast food. Hochard accompanied Richardson and Robinson so they could drop him off at a friend's house. When the trio left the apartment, Tate and Martinez remained, but when Richardson and Robinson returned a short while later, Tate and Martinez had left.

Later, Richardson and Robinson left the apartment again to pick up Hochard and to go to Robinson's mother's house to give Robinson's mother drugs in exchange for watching Robinson's children.

About 3 hours later, as Robinson, Richardson, and Hochard returned to Mayorga's apartment building, they saw police cars and an ambulance outside the building. Richardson parked the car a few blocks away and walked towards the apartment building, getting close enough to see police in Mayorga's apartment, but leaving without talking to police or learning what had happened.

## Defense Strategy and Case

Clay attempted to cast doubt on his guilt, arguing Rios-Patron initially correctly identified Richardson as the shooter and later identified Clay only because he felt threatened by Richardson. Clay also suggested Rios-Patron was influenced by law enforcement's offer to secure a visa for Rios-Patron in exchange for his cooper-

ation. At trial, Rios-Patron denied that he was afraid of Richardson and said he did not accept the offer of a visa.

Attempting to impeach the State's witnesses, Clay elicited from Tate, West, Richardson, and Robinson that they had used drugs the night of the shooting. And Rios-Patron testified that he had been drinking beer in Mayorga's apartment. Clay also elicited that many of the witnesses—including Tate, Robinson, and Hochard—were acquaintances of Richardson, who would cover for him.

Clay's only witness was Verle Strutton, who testified that at about 4:30 a.m. the morning after the shooting, he heard Tate arguing with her boyfriend, who was staying with Strutton, and heard Tate say, "I didn't do it, Reuban [Richardson] did."

*Convictions and Sentencing*

The jury convicted Clay as charged, finding him guilty of felony murder, attempted aggravated robbery, and criminal possession of a firearm.

At sentencing, the district court orally sentenced Clay to 25 years to life for his murder conviction, a consecutive 130 months' imprisonment for attempted aggravated robbery, and a concurrent 8 months' imprisonment for felony possession of a firearm. The district court also orally imposed lifetime parole. The journal entry of sentencing, however, reflects that the district court sentenced Clay to 20 years to life imprisonment and lifetime postrelease supervision. The journal entry also reflected the court's order that Clay reimburse the Board of Indigent Defense Services (BIDS) $1,000.

Clay directly appealed his convictions and sentence to this court. Our jurisdiction arises under K.S.A. 22-3601(b)(1).

## ANALYSIS

*The failure to give a lesser included instruction on unintentional second-degree murder was not error.*

Clay first argues the district court erred by failing to *sua sponte* instruct the jury on unintentional second-degree murder and involuntary manslaughter as lesser included offenses of felony murder.

*Standard of Review*

Because Clay did not object to the lack of an unintentional second-degree murder or involuntary manslaughter instruction, we review for clear error. See K.S.A. 22-3414(3); *State v. Williams*, 295 Kan. 506, Syl. ¶¶ 3-4, 510, 286 P.3d 195 (2012). Under this standard, we first consider whether the district court erred in failing to give the instruction. A court errs when we determine, using unlimited review, the instruction was both legally and factually appropriate. 295 Kan. at 515-16. Such an error requires reversal when the appellant firmly convinces the court that the omitted instruction was both legally and factually appropriate and that the jury would have reached a different verdict had the instruction been given. 295 Kan. at 516.

*Analysis*

The parties' briefs focus on whether the lesser included instructions were legally appropriate, specifically disagreeing whether the 2012 amendment to K.S.A. 21-5109 can be retroactively applied. The amendment, effective after the date of Clay's trial, specified that felony murder has no lesser included offenses and effectively nullified this court's decision in *State v. Berry*, 292 Kan. 493, 254 P.3d 1276 (2011). There, we required trial courts to instruct on lesser included offenses of felony murder. See also *State v. Wells*, 297 Kan. 741, 761-62, 305 P.3d 568 (2013) (holding the 2012 legislative amendment to K.S.A. 21-5109 could not be retroactively applied because legislature did not indicate it should be applied retroactively and amendment was substantive rather than procedural).

But after the parties filed briefs in this case, the legislature amended K.S.A. 21-5402 to again provide that felony murder has no lesser included offenses and to specify the amendment's application to all cases pending on appeal. L. 2013, ch. 96, sec. 2; see also *State v. Todd*, 299 Kan. 263, 274-75, 323 P.3d 829 (2014). We have since concluded that the amendment can and should be retroactively applied. See 299 Kan. at 278-79 (concluding legislature intended 2013 amendment to K.S.A. 21-5402 to be retroactively applied and doing so does not violate the Ex Post Facto Clause).

Based on *Todd*, we conclude Clay was not legally entitled to either an unintentional second-degree murder instruction or an involuntary manslaughter instruction as a lesser included offense of felony murder.

*The district court erred by issuing an eyewitness identification jury instruction with the degree of certainty factor, but the error does not justify reversal.*

The jury instructions contained an eyewitness identification instruction modeled on PIK Crim. 3d 52.20 and gave the jury seven factors to use when considering Rios-Patron's identifications. Among those factors was, "[t]he degree of certainty demonstrated by the witness at the time of any identification of the accused." Based on our holding in *State v. Mitchell*, 294 Kan. 469, 481, 275 P.3d 905 (2012), the district court erred in submitting this language to the jury.

Clay contends this error constitutes clear error requiring reversal because Rios-Patron's identification of Clay was crucial to the State's case, and without it, the verdict would have been different because no physical evidence linked Clay to the shooting and no one other than Rios-Patron saw Clay at the apartment door.

Preliminarily, the State argues this court should not entertain Clay's argument because Clay's counsel invited the error. Alternatively, it contends the error did not affect the jury's verdict.

*Clay did not invite the error.*

Citing *State v. Bailey*, 292 Kan. 449, 459, 255 P.3d 19 (2011), the State argues Clay's counsel invited any instructional error and Clay is, thus, barred from complaining about instructional error on appeal. In *Bailey*, we declined to consider the defendant's argument regarding an instructional error because the defendant's counsel invited the error by submitting the proposed jury instruction ultimately given by the court.

But the factual circumstances here are distinguishable from those before the court in *Bailey*. Here, prior to the jury receiving the instructions, Clay's counsel informed the district court that its proposed jury instructions contained two eyewitness identification

instructions. Further, Clay's counsel suggested he preferred the instruction with "seven elements," instead of the one with five. The district court agreed with Clay that the "seven-element" eyewitness instruction should be given and advised the parties it had already removed the "five-element" instruction.

We do not equate Clay's counsel's preference for one instruction over another with the circumstances in *Bailey*, where the defendant submitted the instruction at issue and requested the court give that particular instruction. Here, the record contains no indication which, if any, party submitted either of the eyewitness instructions. Nor does the record include the nonpreferred "five-element" instruction. Under these circumstances, we cannot determine whether the objectionable degree of certainty language factored into counsel's preference for the given instruction, and we decline to apply invited error.

*The error was not clearly erroneous.*

Turning to the merits, the State properly concedes the district court erred in issuing an instruction with the degree of certainty factor. See *Mitchell*, 294 Kan. at 481 (disapproving degree of certainty language); see also *State v. Cruz*, 297 Kan. 1048, 1067-68, 307 P.3d 199 (2013) (same). Thus, the only remaining question is whether the erroneous language justifies reversing Clay's convictions.

*Standard of Review/Analytical Framework*

Because Clay did not object to the instruction, we apply the clear error rule. See *State v. Dobbs*, 297 Kan. 1225, 1237, 308 P.3d 1258 (2013) (discussing clear error review and noting reversal is required only if court is "firmly convinced the jury would have reached a different verdict absent the error"); *Williams*, 295 Kan. at 510; see also K.S.A. 22-3414(3).

We have held the degree of certainty language can only impact a jury's verdict when the eyewitness identification is both key to the State's case and the witness expresses a degree of certainty. *Dobbs*, 297 Kan. at 1238 (holding that if answer to either question is "no," then degree of certainty language necessarily did not in-

fluence jury's verdict and error not reversible). But even if both circumstances are present, "other procedural safeguards" can mitigate the potential prejudice, including the constitutional right to confront witnesses and to effective assistance of counsel. 297 Kan. at 1238.

### Analysis

Here, Rios-Patron was the only eyewitness to the shooting and no physical evidence linked Clay to the crime. Further, in its closing argument the State focused on Rios-Patron's identification and attempted to minimize Rios-Patron's initial identification of Richardson. See *Dobbs*, 297 Kan. at 1239 (finding identification crucial when only one person witnessed shooting, no physical evidence placed defendant at scene, and prosecutor characterized eyewitness as "star witness"). Under these circumstances, we conclude Rios-Patron's identification of Clay as the shooter was crucial to the State's case.

Further, Rios-Patron expressed a degree of certainty in his identification of Clay as the shooter. Specifically, when the prosecutor asked Rios-Patron "[h]ow sure" he was of his identification of Clay in the second lineup, Rios-Patron replied, "Well, it's the same. It's him." Detective Garrison also testified that after Rios-Patron looked at side-by-side photos of Clay and Richardson, he was "adamant" Clay was the shooter. See *Dobbs*, 297 Kan. at 1239 (holding witness expressed degree of certainty when law enforcement officers testified witness did not express uncertainty in identifying shooter and witness testified his use of ambiguous words was not meant to imply uncertainty); *State v. Marshall*, 294 Kan. 850, 868, 281 P.3d 1112 (2012) (concluding witness expressed degree of certainty when witness responded affirmatively when asked whether he was "certain" as to his identification of defendant).

Because Rios-Patron's identification of Clay was crucial and Rios-Patron expressed a degree of certainty regarding that identification, the erroneous degree of certainty language in the eyewitness identification instruction may have impacted the jury. But that does not end our analysis. Instead, we must consider whether procedural safeguards mitigated any harm here.

Through cross-examination and in closing argument, defense counsel argued Rios-Patron's identification of Richardson was believable and his identification of Clay was not. He pointed out that Rios-Patron testified at the preliminary hearing that he was afraid of Richardson, and he argued Rios-Patron changed his identification to avoid angering Richardson.

Further, while Rios-Patron's identification of Clay was key to the State's case, the State presented a strong circumstantial case against Clay. Witnesses testified regarding Clay's involvement in the attempted robbery and the fact that he brought a gun to Mayorga's door prepared to fire a warning shot. Witnesses also testified to other evidence of Clay's guilt, including that Clay changed his clothes after the shooting and failed robbery, assisted in burning the Jeep, and said, "Fuck, the motherfucker died," when he learned through a news report that Reynoza had died of the gunshot wound.

Given the relative strength of the State's case, the extensive cross-examination of Rios-Patron, and the unique circumstances of this case, we conclude the erroneous degree of certainty language in the eyewitness instruction does not require reversal.

*The district court did not err in refusing to grant Clay a new trial because the jury learned he previously was in prison and that he was in custody during the trial.*

Clay argues the district court erred in denying his motion for a new trial because he was prejudiced when the jury improperly learned he was in custody when it saw him escorted by deputies and when a witness testified he knew Clay from prison.

Our resolution of these issues requires consideration of additional relevant facts.

*Additional Facts*

During Sikorski's direct testimony, the prosecutor asked, "How do you know Aaron Clay?" Sikorski replied, "We was [sic] in prison together." Defense counsel immediately objected and requested a mistrial. The prosecutor responded that he had not asked the question to elicit a response about prison but to establish that Sikorski

"knew [Clay], they were friends, to establish their relationship." The district court took the mistrial motion under advisement and asked defense counsel if he wanted the court to instruct the jury to disregard Sikorski's statement. Clay declined the admonishment, explaining he did not want more attention drawn to the statement. The district court later denied Clay's request for a mistrial, concluding Sikorski's isolated statement was unlikely to influence the jury.

The following day, defense counsel alerted the district court that a juror had seen Clay in the hallway as deputies escorted him to the courtroom. Defense counsel expressed concern that the juror "seeing [Clay] in cuffs could negatively affect" the juror's view of Clay. But defense counsel also expressed uncertainty as to whether Clay was handcuffed when the juror saw him. Further, defense counsel specifically advised the court he did not want the court to question the juror as to whether the juror saw Clay in handcuffs because "then it's going to be obvious that he's in cuffs." Instead, defense counsel requested the court dismiss the juror. The district court denied the request.

A few days later, Clay objected on the record that all of the jurors had observed two deputies walk Clay down the hallway and they could see that Clay was "obviously in custody." The district court asked if Clay was handcuffed at the time, and the deputies indicated he was not. The district court then denied Clay's "motion."

After the jury entered its verdict, Clay filed a motion for new trial. Among the asserted bases for Clay's request was that the district court erred in not granting a mistrial after Sikorski testified he knew Clay from prison and members of the jury twice saw Clay in custody and "in shackles."

The district court concluded Sikorski's statements did not affect the jury's verdict. Further, the court noted that although Clay wore a leg brace, the brace was underneath his clothing while he was transported and deputies removed the brace whenever possible. The court also determined the single instance in which a jury member may have seen Clay in handcuffs did not present sufficient basis to grant a mistrial.

*Standard of Review*

A district court should grant a defendant's request for a new trial when doing so is in "the interest of justice." K.S.A. 22-3501. This court reviews a district court's ruling on a motion for new trial for abuse of discretion. *State v. Rodriguez*, 295 Kan. 1146, 1158, 289 P.3d 85 (2012). A district court abuses its discretion when the action is (1) arbitrary, fanciful, or unreasonable; (2) based on an error of law; or (3) based on an error of fact. 295 Kan. at 1156.

*Analysis*

*Members of the Jury See Clay in Custody*

On appeal, Clay asserts the district court should have granted him a new trial because the jury saw him being escorted by deputies and thus learned he was in custody.

But we see no error in the district court's refusal to order a new trial. Notably, the defendant cites no authority indicating a jury's momentary view of the defendant in police presence unfairly prejudices the defendant. Nor is this a case where a defendant is forced to wear visible restraints during trial, constantly reminding a jury the defendant is in custody and implying the defendant is dangerous. *Estelle v. Williams*, 425 U.S. 501, 504-05, 96 S. Ct. 1691, 48 L. Ed. 2d 126 (1976) (forcing defendant to appear in prison garb before jury is "constant reminder" of defendant's status).

Further, Clay's brief faults the district court for not asking the members of the jury whether seeing Clay in custody impacted their view of the defendant. But any fault in failing to inquire rests with Clay. He specifically requested that the trial court not question the juror who first saw Clay in the deputies' presence about what the juror saw. Additionally, when the entire jury saw Clay with deputies, defense counsel merely placed an "objection" on the record.

Finally, Clay's motion for new trial did not even focus on the impact of the jury seeing Clay being escorted by deputies. It focused on the potential impact of the jury seeing Clay in handcuffs, but there was no evidence any member of the jury saw Clay in handcuffs.

Under these circumstances, we conclude the district court did not abuse its discretion in denying Clay's motion for new trial based on the jury's observation of Clay in the presence of deputies.

*Sikorski's Testimony that He Knew Clay from Prison*

Clay argues Sikorski's testimony that he knew Clay from prison justifies a new trial when considered in conjunction with the prejudice associated with the jury seeing him in the presence of deputies.

A mistrial is warranted only if prejudicial conduct is so great it is "impossible to proceed with the trial without injustice." K.S.A. 22-3423(1)(c). Here, any prejudice arising from Sikorski's testimony was not strong. Sikorski only fleetingly referenced knowing Clay in prison, and neither party mentioned it in closing argument. Additionally, the trial court offered to attempt to cure the prejudice by admonishing the jury not to consider Sikorski's testimony, but Clay rejected that offer. See *State v. Rinck*, 256 Kan. 848, 853-54, 888 P.2d 845 (1995) (concluding witness' remark that defendant had been in prison did not warrant a mistrial because testimony was unsolicited, court offered limiting instruction, and statement was isolated).

Under these circumstances, we conclude the isolated statement did not sufficiently prejudice the defendant to justify a mistrial or a new trial.

*The district court's failure to answer jury questions orally in open court is not reversible error.*

During deliberation, the jury asked two questions: (1) whether felony murder required the State prove premeditation, and (2) whether the record included the photographic lineup containing Richardson's picture. In open court with Clay present, the district court drafted responses to both questions with the assistance of counsel. The court then submitted those written responses to the jury, and neither party objected to that procedure.

On appeal, Clay argues that by responding to the jury's questions in writing, the district court violated his constitutional rights to an impartial judge and a public trial and his statutory and constitutional right to be present.

*Right to an Impartial Judge and Right to a Public Trial*

Clay asserts without authority that the district court violated his fundamental right to a public trial by delivering its written answers to the jury's questions to the jury room, thus preventing members of the public from having an opportunity to observe this stage of the trial. As we previously have observed, courts have addressed similar assertions with mixed results. See *State v. Bowen*, 299 Kan. 339, 356, 323 P.3d 853 (2014). Plus, Clay has failed to adequately brief this issue by failing to cite relevant authority or engage in substantial analysis. See 299 Kan. at 356 (noting claim of error supported by little authority or analysis is "particularly suspect" when defendant asserts structural error); see also *State v. Verser*, 299 Kan. 776, 790-91, 326 P.3d 1046 (2014) (refusing to consider whether answering jury questions in writing violated right to public trial and impartial judge because law cited by defendant only supported rights "in the abstract"); *State v. Torres*, 280 Kan. 309, 321, 121 P.3d 429 (2005) (" '[P]ressing a point without pertinent authority, or without showing why it is sound despite a lack of supporting authority . . . is akin to failing to brief an issue.' [Citation omitted.]").

Clay's assertion that the written responses violated his right to an impartial judge suffers from a similar lack of support. Clay relies almost exclusively on *State v. Brown*, 362 N.J. Super. 180, 827 A.2d 346 (2003), but the *Brown* court did not comment on Brown's right to an impartial judge. See also *Bowen*, 299 Kan. at 356 (deeming similar argument abandoned when defendant cited only *Brown* in support of argument).

Because Clay has failed to adequately brief either claim, we decline to consider their merit.

*Right to Be Present*

Finally, Clay raises the more familiar argument that the district court violated his statutory and constitutional rights to be present by sending written responses to the jury rather than answering the jury's questions in Clay's presence. See K.S.A. 22-3420(3) (providing that responses to jury requests for information on law or evidence shall be given "in the presence of the defendant"); *State v.*

*Calderon*, 270 Kan. 241, 245, 13 P.3d 871 (2000) (noting defendant's right to be present arises from Sixth Amendment's Confrontation Clause and due process right to attend critical stages of criminal proceeding).

We recently clarified that a district court violates a defendant's constitutional and statutory right to be present when it answers a jury question in writing. See *Verser*, 299 Kan. at 789; *Bowen*, 299 Kan. at 357-58; *State v. King*, 297 Kan. 955, 967, 305 P.3d 641 (2013).

Because the error violates both the Constitution and statute, we apply a constitutional harmless error standard of review. *Bowen*, 299 Kan. at 357. When a district court communicates with a jury outside of a defendant's presence, we evaluate the impact of the error by considering: (1) the strength of the prosecution's case; (2) whether an objection was lodged; (3) whether the communication concerned a critical aspect of the trial; and (4) the ability of a posttrial remedy to mitigate the error. See *Bowen*, 299 Kan. at 357 (citing *State v. Herbel*, 296 Kan. 1101, 1111, 299 P.3d 292 [2013]).

We are convinced any error here was harmless. Notably, Clay does not quibble with the content of the answers, only the manner in which the court delivered them. Further, Clay was present and participated in constructing the answers, and aside from rampant speculation, there is no evidence anything questionable occurred when the courier delivered the response. See *King*, 297 Kan. at 965 (finding harmless error when district court answered jury question in writing, in part, because procedure did not impact answer). Further, Clay failed to lodge an objection to the procedure and elected not to pursue any posttrial remedies, preventing both the district court and this court from fully exploring any actual harm. *Bowen*, 299 Kan. at 357-58 (finding no reversible error in district court's failure to answer jury question in defendant's presence in open court because defendant lodged no objection and pursued no posttrial remedies).

In sum, we are confident that the procedure used by the trial court, though error, had no appreciable impact on the jury's verdict, and we decline to reverse Clay's convictions.

*Clay's sentence must be vacated.*

Finally, Clay asserts his sentence is unlawful because of three sentencing errors: (1) the district court orally sentenced Clay to 25 years to life when K.S.A. 22-3717(b)(2) only permitted a sentence of 20 years to life; (2) the district court orally indicated Clay was subject to lifetime parole but the journal entry improperly subjected Clay to lifetime postrelease supervision; and (3) the district court failed to inquire about Clay's ability to reimburse the Board of Indigent Defense Services (BIDS) for attorney fees before ordering him to pay $1,000.

The State concedes each error. See K.S.A. 22-3717(b)(2) (providing offenders sentenced for certain off-grid crimes, including first-degree felony murder, "shall be eligible for parole after serving 20 years"); *State v. Ross*, 295 Kan. 1126, 1134, 289 P.3d 76 (2012) (holding that defendant convicted of felony murder is subject to lifetime parole rather than lifetime postrelease supervision); *State v. Robinson*, 281 Kan. 538, 543, 132 P.3d 934 (2006) (holding district court is statutorily required to inquire on the record about defendant's ability to repay BIDS fees). Accordingly, we vacate Clay's sentence and remand for resentencing consistent with these authorities and for the district court to inquire about Clay's ability to repay BIDS.

Convictions affirmed, and sentence affirmed in part, vacated in part, and remanded with directions.