NOT DESIGNATED FOR PUBLICATION

No. 121,581

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

ANDRES G. PENA-GONZALES,
*Appellant*,

v.

STATE OF KANSAS,
*Appellee*.

MEMORANDUM OPINION

Appeal from Shawnee District Court; CHERYL A. RIOS, judge. Opinion filed June 26, 2020.
Affirmed.

*Jennifer Chaffee*, of Free State Law, of Perry, for appellant.

*Kurtis Wiard*, assistant solicitor general, and *Derek Schmidt*, attorney general, for appellee.

Before ARNOLD-BURGER, C.J., WARNER, J., and LAHEY, S.J.

PER CURIAM:  Andres G. Pena-Gonzales appeals the district court's summary
denial of his K.S.A. 60-1507 motion alleging ineffective assistance of his trial counsel.
Finding no error by the district court, we affirm.

FACTUAL AND PROCEDURAL BACKGROUND

In 2012, a jury convicted Pena-Gonzales of rape of a child under the age of 14 in
violation of K.S.A. 21-3502(a)(2), furnishing an alcoholic beverage to a minor for illicit

purposes in violation of K.S.A. 21-3610b, and aggravated indecent solicitation of a child under the age of 14 in violation of K.S.A. 21-3511(b).

The underlying facts were set forth in Pena-Gonzales' direct appeal:

"The events leading to these convictions began in April 2009 when [B.C.] contacted Pena-Gonzales ask[ing] him for a ride to Topeka so she could hang out at the home of a friend. . . . [B.C.] and her older brother had known Pena-Gonzales for years and they referred to him as their 'uncle.'

"Pena-Gonzales agreed to give the children a ride. When he arrived at their house, he had alcoholic beverages in his car, either bottles of Smirnoff Ice or strawberry daiquiris. He opened the bottles and offered them to the children. [B.C.] drank a couple of bottles on the ride to Topeka. Her brother, who was age 17, also consumed the beverages.

"Rather than taking the children directly to the friend's house, Pena-Gonzales told them he was going to stop first at a gas station and get a pizza. At the gas station he did not buy a pizza but bought some Black & Mild cigars, which he shared with [B.C.]'s brother. Pena-Gonzales then drove the children to his house, where he said he wanted to show the boy his new truck. After checking out the truck, Pena-Gonzales and the boy went inside the house where [B.C.] was playing with the dog.

"At that point, [B.C.]'s brother became sick from the alcohol he drank, so he stepped outside. When he tried to reenter the house, the doors were locked. The boy gave up trying to reenter the house and called a friend and left his sister alone with Pena-Gonzales.

"According to [B.C.], when her brother stepped outside Pena-Gonzales locked the front door, and she 'knew something bad was going to happen.' When she was unable to get out the back door she ran to the bathroom and tried to lock the door, but there was no lock. Pena-Gonzales entered the bathroom and forced [B.C.]'s pants down. Pena-Gonzales said: '[J]ust let me put my penis in between your legs.' [B.C.] resisted, but Pena-

2

Gonzales held her down, and [B.C.] felt his penis briefly penetrate her vagina. He then withdrew, masturbated on her leg, and then left.

"[B.C.] opened the door and found her clothes sitting next to the door, along with her cell phone, a Black & Mild cigar, and a $50 bill. B. grabbed these items, got dressed, and fled and called for help.

"When the police found her, she reported that she had been raped. Lieutenant Joe Perry reported that [B.C.] told him that her brother had taken her to her uncle's house, and her uncle offered to give her alcohol if he could perform oral sex on her. She said that when her brother left the house, her uncle raped her. She told Lieutenant Perry that Pena-Gonzales gave her two cigars and a $50 bill not to say anything. While Lieutenant Perry was talking to her, [B.C.] took the cigars and money out of her pocket and threw them on the ground and then fell to the ground 'rocking back and forth and started crying hysterically.'

"At the hospital, [B.C.] told Detective Roger Smith that her 'uncle' had raped her. Joy Thomas, a sexual assault nurse examiner, examined [B.C.] According to Thomas, [B.C.] told her that Pena-Gonzales had penetrated her vagina twice, but she was unsure whether it was his penis or his finger that he put inside of her. [B.C.] also told Thomas that Pena-Gonzales had sucked on her right breast. Thomas took for examination seminal fluid samples found on [B.C.]'s leg, along with DNA samples from [B.C.]'s breast and underwear. [B.C.]'s blood alcohol level was 0.01." *State v. Pena-Gonzales*, No. 112,174, 2016 WL 1614025, at *1-2 (Kan. App. 2016) (unpublished opinion).

The district court sentenced Pena-Gonzales to life in prison with a mandatory minimum of 25 years. Pena-Gonzales directly appealed his convictions and another panel of our court affirmed the convictions. 2016 WL 1614025, at *15. The Supreme Court denied his petition for review. 306 Kan. 1328 (2017).

On January 8, 2018, Pena-Gonzales filed a timely motion under K.S.A. 60-1507, alleging ineffective assistance of counsel from his trial attorneys. Pena-Gonzales alleged

seven counts of ineffective assistance of trial counsel based on various trial errors and argued his appellate attorney failed to raise the issues on his direct appeal.

The district court subsequently appointed counsel who filed an amended K.S.A. 60-1507 motion on March 23, 2019. The amended motion raised three ineffective assistance of counsel claims:  (1) failure to investigate impeachment evidence against a witness, N.C., and the victim; (2) failure to investigate exculpatory evidence pertaining to the ownership of the underwear allegedly worn by B.C.; and (3) failure to have a translator present during private attorney-client meetings. For all three claims, Pena-Gonzales argued the trial would have resulted in a different outcome had his trial counsel been effective.

On May 21, 2019, the district court issued a thorough, well-written memorandum decision and order summarily denying Pena-Gonzales' motion. The district court addressed the three claims raised in the amended motion and found that neither of Pena-Gonzales' trial attorneys were ineffective in representing him and that he failed to establish any prejudice. Pena-Gonzales filed a timely notice of appeal.

ANALYSIS

Our standard of review provides:  When the district court summarily dismisses a K.S.A. 60-1507 motion, an appellate court conducts a de novo review to determine whether the motion, files, and records of the case conclusively establish that the movant is not entitled to relief. *Beauclair v. State*, 308 Kan. 284, 293, 419 P.3d 1180 (2018).

To avoid the summary denial of a motion brought under K.S.A. 60-1507, the movant bears the burden of establishing entitlement to an evidentiary hearing. To meet this burden, the movant's contentions must be more than conclusory, and the movant must set forth an evidentiary basis to support those contentions or the basis must be

4

evident from the record. If such a showing is made, the district court is required to hold a hearing unless the motion is a "second" or "successive" motion seeking similar relief. *Sola-Morales v. State*, 300 Kan. 875, 881, 335 P.3d 1162 (2014).

*Abandoned Points*

After filing his notice of appeal, Pena-Gonzales also filed an objection to the district court's findings of facts and conclusions of law. In his objection, Pena-Gonzales asserted he raised seven claims of ineffective assistance of counsel in his original motion, but the district court only ruled on the three claims raised in the amended motion. On appeal, Pena-Gonzales states he objected on these grounds, but he does not provide any substantive argument challenging the district court's failure to address the claims brought in his original 60-1507 motion. Instead, Pena-Gonzales' appellate brief only addresses the three ineffective assistance of counsel claims set forth in the amended 60-1507 motion and ruled on by the district court. Generally, a point raised incidentally in a brief and not argued therein is deemed waived and abandoned. See *Russell v. May*, 306 Kan. 1058, 1089, 400 P.3d 647 (2017). Accordingly, this opinion will address only the three claims brought in the amended motion.

Kansas Supreme Court Rule 6.02(a)(5) (2020 Kan. S. Ct. R. 35) requires an appellant to include "the arguments and authorities relied on" in its appellate brief. Past courts have made clear that an appellant is not in compliance with this rule when he or she fails to "cite relevant authority or engage in substantial analysis." *State v. Clay*, 300 Kan. 401, 416, 329 P.3d 484 (2014). Failure to comply with this rule results in abandonment of the claim. See *Friedman v. Kansas State Bd. of Healing Arts*, 296 Kan. 636, 645, 294 P.3d 287 (2013). Also, as stated above, a point raised incidentally in a brief and not argued therein is deemed waived and abandoned. See *Russell*, 306 Kan. at 1089. The State contends Pena-Gonzales failed to comply with appellate procedure because he failed to include supporting legal authority or substantive analysis in his brief. Although

we see merit in the State's arguments, we nonetheless address Pena-Gonzales appeal on the merits.

In Kansas, it is well-settled:

> "To prevail on a claim of ineffective assistance of trial counsel, a criminal defendant must establish (1) that the performance of defense counsel was deficient under the totality of the circumstances, and (2) prejudice, i.e., that there is a reasonable probability the jury would have reached a different result absent the deficient performance. *Sola-Morales v. State*, 300 Kan. 875, 882, 335 P.3d 1162 (2014) (relying on *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674, *reh. denied* 467 U.S. 1267 [1984])." *State v. Salary*, 309 Kan. 479, 483, 437 P.3d 953 (2019).

Under the prejudice prong, "a reasonable probability is a probability sufficient to undermine confidence in the outcome." *State v. Sprague*, 303 Kan. 418, 426, 362 P.3d 828 (2015).

"'Judicial scrutiny of counsel's performance in a claim of ineffective assistance of counsel is highly deferential and requires consideration of all the evidence before the judge or jury. The reviewing court must strongly presume that counsel's conduct fell within the broad range of reasonable professional assistance.'" *State v. Johnson*, 304 Kan 924, 951, 376 P.3d 70 (2016).

Each of Pena-Gonzales' claims is addressed below.

DID TRIAL COUNSEL FAIL TO INVESTIGATE IMPEACHMENT EVIDENCE?

Pena-Gonzales alleges his trial counsel "failed to diligently investigate, explore, and/or introduce evidence at trial impeaching the [credibility] of witnesses [N.C.] and [B.C.]" He contends his trial counsel should have procured phone records from B.C. and

N.C. because this evidence (1) may have led to their impeachment given they each testified differently in regards to "who called and arranged for [movant] to give them a ride into Topeka" or (2) the phone records "may have produced a lead to the discovery of other exculpatory evidence."

The district court found that Pena-Gonzales' claim was based on speculative evidence and he failed to show how the lack of the phone records resulted in any prejudice. The district court stated:

"[T]he phone records, if they exist, may or may not contain any evidence relevant to impeachment. As such, the existence of these phone records and any evidence therein is purely speculative. Speculative evidence, as stated in *Barahona*, is insufficient to mandate a hearing under K.S.A. 60-1507. [Movant] has the burden to show there is some real, not speculative, evidence in order for the court to grant the request for an evidentiary hearing. In other words, Pena-Gonzales must assert how having phone records would have resulted in impeachment and how it is relevant to his claim that counsel was ineffective. Additionally, Pena-Gonzales is required to prove that the absence of the phone records is prejudicial. Assuming phone records did exist and that they were admitted at trial. Pena-Gonzales cannot say and the Court does not find that a different jury verdict would result. [B.C.] and [N.C.] each testified differently at trial as to the reasons for their unplanned trip from Silver Lake to Pena-Gonzales home on April 18, 2009. They were subject to cross-examination as to their inconsistencies for the jury to hear and consider. In spite of their inconsistencies, the jury found the evidence sufficient to convict Pena Gonzales beyond a reasonable doubt. The absence of phone records was not prejudicial."

On appeal, Pena-Gonzales simply argues that an evidentiary hearing was warranted. However, just as the district court ruled, Pena-Gonzales failed to provide an evidentiary basis for his claim, and a basis does not appear in the record. First, Pena-Gonzales asserted that trial counsel failed to investigate phone records, but he did not identify which phone records he was referring to or provide any facts to show that these

7

records actually existed. "Merely speculative allegations are insufficient to mandate an evidentiary hearing." *State v. Barahona*, 35 Kan. App. 2d 605, 611, 132 P.3d 959, *rev. denied* 282 Kan. 791 (2006).

Second, even if the phone records existed, Pena-Gonzales failed to explain how they would have been used as impeachment evidence or otherwise aided in his defense. Pena-Gonzales admitted that B.C.'s and N.C.'s testimony already differed at trial regarding who called Pena-Gonzales for the ride. Both were cross-examined on their testimony, and the jury was able to evaluate their credibility. See *State v. Butler*, 307 Kan. 831, 858, 416 P.3d 116 (2018) ("In a similar fashion, it would make sense for trial counsel to not subpoena Butler's phone records when there was no indication it would support Butler's defense.").

Pena-Gonzales' motion asserted the outcome would have been different but for his counsel's deficient performance but he does not provide any prejudice argument on appeal. As noted by the district court, Pena-Gonzales did not explain how any failure to obtain phone records could have outweighed the other overwhelming evidence presented at trial. Regardless of any inconsistent testimony regarding who initially called Pena-Gonzales for a ride, B.C. consistently identified Pena-Gonzales as her rapist. B.C. and N.C. both testified that B.C. was alone in the house with Pena-Gonzales and the doors were locked just before the incident. B.C. testified that immediately after the rape occurred, Pena-Gonzales left her $50 and a cigar on her pants and underwear before she put them back on. The DNA from the seminal fluid obtained from B.C.'s shin and underwear—which were tested immediately after the assault—matched to Pena-Gonzales. In addition, B.C. testified Pena-Gonzales attempted to solicit sexual acts from her in exchange for $100 on a prior occasion. As a result, the district court did not err in ruling that an evidentiary hearing was not warranted on this issue.

Pena-Gonzales argues that his trial counsel failed to investigate whether the underwear B.C. was wearing at the time of the rape could have belonged to his live-in girlfriend. Pena-Gonzales' motion asserted that he informed trial counsel that his girlfriend could have information helpful to his defense, but counsel failed to investigate that possibility. But Pena-Gonzales added that "it was only at trial that [movant] learned the description of the underwear and believes that the underwear found on [B.C.] belonged to his girlfriend . . . and not [B.C.]"

The evidence introduced at trial showed that Pena-Gonzales' DNA was found on B.C.'s underwear. Pena-Gonzales appears to allege that he could have provided a plausible explanation for the DNA match if he could show that the underwear belonged to his girlfriend, with whom he allegedly had intercourse with earlier that day.

In denying relief on this issue, the district court ruled:

"Pena-Gonzales also claims that [trial counsel] provided ineffective assistance of counsel by failing to investigate evidence regarding who owned the underwear placed into evidence at trial. He claims that [trial counsel] should have investigated the ownership of the underwear after Pena-Gonzales informed him of his live-in girlfriend before trial. He also claims that [trial counsel] should have objected to the introduction of the underwear when Pena-Gonzales told him at trial and as the evidence was being offered that the underwear might belong to his girlfriend. However, the fact that Pena-Gonzales had a live-in girlfriend alone would not lead to the notion that the underwear worn by [B.C.] when she was examined by SANE belonged to Pena-Gonzales' girlfriend. Because the standard for ineffective assistance of counsel claims is of objective reasonableness, the question to be asked is whether a reasonable attorney informed that Pena-Gonzales has a live-in girlfriend, should have investigated ownership of the underwear worn by [B.C.] There is no particular connection between [the girlfriend]'s presence in [Pena-Gonzales'] life and the undergarments worn by [B.C.] As such, it

9

cannot be concluded that [trial counsel] was objectively unreasonable in deciding not to look into the ownership of the underwear, or that he failed to object to its admission at trial.

"Pena Gonzales must also demonstrate how, if at all, he was prejudiced by [trial counsel]'s failure to investigate ownership of the underwear, and by his failure to object to admission of the same at trial.

"To establish prejudice, it must be shown that it is reasonable to assume that a different result (guilty verdict) would have been reached but for counsel's inaction. In order to reach a different verdict, the jury would have to leap to the assumption that [B.C.] might have inadvertently picked up another woman's underwear when she picked up her own pants and didn't recognize that they were not her underwear when she put them on. The underwear she wore were collected and preserved by the SANE nurse at the hospital. The jury would further have to discount [B.C.]'s testimony (and corroborating DNA evidence) that defendant removed her underwear, raped her and then ejaculated his seminal fluid onto her shin.

"Prejudicial effect may have been more probable if DNA evidence was only collected from the underwear. However, DNA evidence consistent with Pena-Gonzales was collected from [B.C.]'s shin as well as the underwear. [B.C.]'s testimony, the consistent DNA evidence, and the physical contact between [B.C.] and [Pena-Gonzales] would all be evidence that would allow a jury to convict defendant even if [trial counsel] had offered evidence that the underwear might have belonged to Pena-Gonzales' girlfriend."

On appeal, Pena-Gonzales does not provide any argument to refute the district court's extensive findings on this claim, and we find the record supports the district court's findings for multiple reasons. First, Pena-Gonzales' motion alleged that he informed counsel of his live-in girlfriend but did not provide any specific facts of his discussion with counsel. He does not indicate how his girlfriend was connected to the case or what information she could provide in his defense—he only asserted that "he informed counsel that [his girlfriend] may have information helpful to his defense."

10

Further, even after the trial, Pena-Gonzales does not allege the underwear belonged to his girlfriend, only that it was possible his girlfriend may have had a similar pair. Again, "[m]erely speculative allegations are insufficient to mandate an evidentiary hearing." *Barahona*, 35 Kan. App. 2d at 611.

Second, under *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674, *reh. denied* 467 U.S. 1267 (1984), a movant is required to prove that his or her counsel's performance was deficient under the circumstances. Here, the district court assessed trial counsel's decision not to investigate the ownership of the underwear for reasonableness and found this decision was not unreasonable. Pena-Gonzales admitted he did not learn of the description of the underwear until trial and that is when he realized the underwear could have belonged to his girlfriend. If this fact is accepted as true, trial counsel would not have had any reason to believe the underwear could have belonged to anyone else until it was introduced at trial. "A court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Reed v. State*, No. 119,484, 2020 WL 1070350, at * 5 (Kan. App. 2020) (unpublished opinion), *petition for rev. filed* April 1, 2020.

At trial, B.C. testified she was wearing her underwear just before the rape occurred. Right after the rape occurred, B.C. stated she located her underwear and her pants outside the bathroom door and put them back on just before leaving the house. B.C. told the SANE nurse during the examination that she was still wearing the clothing, including the underwear, she wore at the time of the rape. Further, the testimony reflects that B.C. was the only person in the house with Pena-Gonzales at the time of the rape, and there is no indication any other underwear was near the scene of the rape.

As part of Pena-Gonzales' motion, he attached a letter purportedly written by his girlfriend. In the letter, his girlfriend explains the underwear belonged to her and stated

11

Pena-Gonzales' seminal fluid was on the underwear because they had intercourse earlier that day. The letter alleges the girlfriend took the underwear off at some point while N.C. and B.C. were at the house. However, this letter was not dated or notarized, and there is nothing in the letter to substantiate the contents or the author. The letter does not explain how B.C. came to be wearing the girlfriend's underwear. And, as the district court found, this evidence also does not explain how Pena-Gonzales' seminal fluid was found on B.C.'s shin.

In sum, Pena-Gonzales' argument relies on speculative evidence and does not explain how trial counsel was ineffective in failing to investigate evidence which he had no reason to believe existed at the time. Pena-Gonzales makes no showing of prejudice. The district court properly dismissed this claim.

## DID TRIAL COUNSEL FAIL TO OBTAIN A TRANSLATOR?

Pena-Gonzales argued he received ineffective assistance of counsel because his attorneys did not have a translator present during their private communications. Pena-Gonzales appears to argue that an interpreter was necessary during private conversations with trial counsel because English is not his primary language and he could not communicate how his girlfriend could have been used as part of his defense. Pena-Gonzales provided the following statements in support of his claim:

> "The [movant] was first represented in the district court by [counsel], however during the course of her representation [counsel] did not utilize the services of an interpreter to communicate with [movant], who's primary language is Spanish and not English. [Movant] had engaged in conversation with [counsel] and had made her aware of his live-in girlfriend . . . . [Movant] was then provided with new counsel . . . who represented him in trial and at sentencing. [Trial counsel] had arranged for an interpreter in court, but did not use an interpreter for all conversations between himself and [movant]. [Movant]

12

again informed [trial] counsel that [his girlfriend] may have information helpful to his defense."

The district court ruled:

"[Pena-Gonzales'] third claim is that [trial counsel] failed to obtain a translator for private attorney-client conversations. This claim is predicated on the idea that Pena-Gonzales was not proficient enough in English to understand certain nuances of his legal defense. The record reflects that Pena-Gonzales was proficient in English. He spoke English at proceedings and indicated that he had spoken to [trial counsel] privately in English as well. Furthermore, Pena-Gonzales wrote some of his own pleadings in English. Although there are some spelling and grammatical errors, it was clear that Pena understands English enough to follow the proceedings. In fact, [trial counsel] specifically said that he believed defendant was proficient in English, though Spanish was his first language. He had been in in the United States for 23 years. [Trial counsel] out of an abundance of caution believed Pena-Gonzales would receive the best defense if he also had an interpreter to assist with any legal terms or nuances that might require a translator.

"[Pena-Gonzales] has not shown how he was prejudiced by the fact that a translator was not present for attorney-client meetings prior to trial. To establish prejudice, Pena-Gonzales must show that [trial counsel]'s decision to forego a translator at some proceedings is unreasonable. The presence of a translator at some, but not all, proceedings, would be reasonable if the client demonstrates a strong proficiency in English and is able to communicate well in that language. [Pena-Gonzales'] ability to speak intelligibly, write his own pleadings, and communicate with [trial counsel] outside of proceedings demonstrates such proficiency. Pena-Gonzales also claims that the use of a translator at jury trial may have prejudiced him because jurors might think he could not speak English and this would somehow prevent him from receiving a fair trial. Defendant has not shown prejudice by the presence of a translator at his trial. He has not shown that the absence of a translator at trial would not have changed the outcome of the case based upon the overwhelming evidence against him discussed herein."

13

On appeal, Pena-Gonzales does not contest the district court's factual findings. Instead, he argues he did not waive his right to an interpreter and he was not informed of his right to an interpreter. Pena-Gonzales' appellate brief provides: "Counsel knew that Mr. Pena Gonzales would not understand everything in a complex case as this was. The right to be present at hearings and to confront accusers requires a translator when necessary for the accused to understand and assist in defense." Pena-Gonzales contends that because an interpreter was used during the trial, this implied an interpreter was necessary for every other communication and proceeding.

Pena-Gonzales alleges his constitutional rights were violated by trial counsel's failure to obtain a translator for all conversations with him. The absence of an interpreter can violate a defendant's right to due process under the Sixth Amendment to the United States Constitution:

> "[A] defendant is guaranteed the right to be present at any stage of the criminal proceeding that is critical to its outcome if the defendant's presence would contribute to the fairness of the procedure. To be 'present' requires that a defendant be more than just physically present. It assumes that a defendant will be informed about the proceedings so he or she can assist in the defense. A defendant's right to be present includes a right to have trial proceedings translated into a language that he or she understands so that he or she can participate effectively in his or her own defense. [Citations omitted.]" *State v. Calderon*, 270 Kan. 241, 245, 13 P.3d 871 (2000).

"Courts have acknowledged that '[c]ounsel's inability to communicate with his client because of a language barrier may render his assistance constitutionally ineffective. [Citation omitted.]' *Gallo-Vasquez v. United States*, 402 F.3d 793, 799 (7th Cir. 2005)." *Rivera v. State*, No. 104,064, 2011 WL 3558232, at *3 (Kan. App. 2011) (unpublished opinion).

14

Trial courts have wide discretion in determining whether providing an interpreter will satisfy constitutional requirements: "[T]his court has acknowledged that, unlike the Kansas statutory provision, the United States Constitution does not require that the court provide an interpreter in all cases in which a defendant's primary language is not English." *State v. Holguin-Loredo*, No. 118,740, 2019 WL 1496775, at *10 (Kan. App.) (unpublished opinion) (citing *Khalil-Alsalaami*, 54 Kan. App. 2d 235, 239, 399 P.3d 264 [2017]), *rev. denied* 310 Kan. 1067 (2019).

Determining whether an interpreter is necessary depends on a variety of factors, "including the complexity of the proceedings, the defendant's knowledge of English, and the testimony presented during trial." *Khalil-Alsalaami*, 54 Kan. App. 2d at 239. But, "[w]e, of course, have not endeavored to suggest just how conversant in English a person must be to satisfy the Sixth Amendment and due process protections afforded criminal defendants." *State v. Wei*, No. 120,443, 2019 WL 5287908, at *8 (Kan. App. 2019) (unpublished opinion).

Here, Pena-Gonzales' motion did not provide a factual basis to show he needed an interpreter. He claimed the interpreter was not present during some of his meetings with trial counsel, but he does not identify or describe those meetings. The only specific complaint he makes is the lack of an interpreter impeded his ability to communicate to trial counsel that his girlfriend might have information useful to his defense. However, Pena-Gonzales asserted that he was not sure if trial counsel did not understand him or simply chose not to use his girlfriend as a part of his trial strategy. See *Sola-Morales*, 300 Kan. at 888 ("Consistent with *Strickland*'s burden on a defendant to establish deficient performance, the defendant bears the burden of demonstrating that trial counsel's alleged deficiencies were not the result of strategy.").

The record reflects an interpreter was present for some of Pena-Gonzales' meetings with trial counsel. Trial counsel specifically requested an interpreter be present

for at least one of their meetings in order to determine if there was a language barrier between himself and Pena-Gonzales. When trial counsel first requested an interpreter, he told the district court he was initially concerned about Pena-Gonzales' ability to understand the proceedings and was unsure if the difficulty was derived from a language barrier or for some other reason. To determine where Pena-Gonzales' confusion stemmed, trial counsel requested an interpreter and informed the district court he intended to have a private meeting with Pena-Gonzales and the interpreter and then he would report back at the next hearing.

At the next hearing, trial counsel explained he and Pena-Gonzales did not have any trouble communicating due to a language barrier and were able to discuss legal strategy and his defense. Trial counsel clarified that Pena-Gonzales was only having difficulty understanding the possible sentences he faced:

> "After discussion with this client it appears that he understands my function. He understands the charges against him and everything related to his case. Where he's having the biggest problem is the potential sentence that he faces upon conviction. A plea offer was made, and if he enters a plea to that specific charge he's facing a sentence that he fails to understand how that sentence can be so large for what occurred in this case. So his understanding of the process and what's going on seems to be there, but his inability to the get his thoughts around the possible sentence, that's the issue.

> "So in terms of being able to move forward to trial, which is what he requests to do at this time, we are set and we will be prepared for that."

At the final status conference hearing before trial, trial counsel told the district court he met with Pena-Gonzales at least four times. Although it is unclear whether an interpreter was present during each of these meetings, trial counsel informed the district court that he and Pena-Gonzales discussed the evidence the prosecution had and the evidence they could use in his defense.

16

The record reflects the only time that Pena-Gonzales had difficulty understanding the legal proceedings was regarding the possible sentences he was facing. Even then, the misunderstanding was not because of the language barrier. Trial counsel explained that Pena-Gonzales did not believe the crime warranted such a severe penalty given his personal experiences in his culture. Pena-Gonzales did not allege he could not understand trial counsel or the proceedings but instead claimed trial counsel could not understand him. However, it does not appear trial counsel had difficulty understanding Pena-Gonzales or any evidence they discussed. Still, trial counsel insisted the interpreter be present as a safeguard.

Even if trial counsel were ineffective for failing to obtain a translator for private meetings, Pena-Gonzales failed to show prejudice. Pena-Gonzales' motion only stated there would have been a different outcome at trial had he and his trial counsel been able to fully understand each other when discussing evidence for a defense.

On appeal, Pena-Gonzales only adds that prejudice is presumed in this situation. While prejudice can sometimes be presumed when there is a failure to appoint an interpreter,

> "a presumption of prejudice is only appropriate . . . in situations in which an error
> '"implicate[s] a basic consideration of fairness or undermine[s] the function of a criminal
> trial'". . . . In the context of determining whether the district court's failure to appoint an
> interpreter jeopardized a defendant's constitutional right . . . so that prejudice should be
> presumed, this court has instructed that it is necessary to determine whether the defendant
> was able to understand the proceedings. [Citations omitted.]" *Khalil-Alsalaami*, 54 Kan.
> App. 2d at 245.

In *Khalil-Alsalaami*, the district court found the defendant was not prejudiced by a lack of an interpreter because he had an excellent grasp on English. On appeal a panel of our court reversed that ruling, finding the defendant was prejudiced by the lack of an

17

interpreter because he could not understand what was happening at trial and could not effectively participate in his own defense given the complexity of the DNA evidence presented and police minimization techniques. 54 Kan. App. 2d at 242-44.

Conversely, in *Holguin-Loredo*, a panel of this court held there was no prejudice where, despite being from Mexico, the defendant lived in the United States from a young age, attended high school in Kansas, "had no learning difficulties, and did well when he applied himself. Many of [the defendant's] evaluations were completed without an interpreter present. Additionally, [the defendant] met with his posttrial counsel five times without an interpreter present." 2019 WL 1496775, at *11. The panel found substantial competent evidence supported the finding that the defendant was fluent in English. 2019 WL 1496775, at *11.

Here, Pena-Gonzales' situation is not one where prejudice is presumed. Just as the district court stated in its ruling, the record reflects Pena-Gonzales' primary language was not English, but he did not appear to have difficulty understanding the proceedings. The district judge who ruled on the K.S.A. 60-1507 motion was the same judge who presided over Pena-Gonzales' pretrial proceedings and trial. Pena-Gonzales has lived in the United States for 23 years. Multiple witnesses stated they spoke to Pena-Gonzales in English and had no difficulty in communicating with him, including B.C. and the detective who investigated the case. Further, all of Pena-Gonzales' pleadings were written in English. Again, on appeal, Pena-Gonzales did not object to these findings or otherwise assert he did not understand the proceedings.

Further, when an interpreter was present, Pena-Gonzales seemed to use the interpreter in only a limited capacity and asked the interpreter for assistance only when he did not understand the legal terminology. At other times throughout the proceedings, Pena-Gonzales told the district court that he understood when he was being informed of various rights. Because prejudice is not presumed here and Pena-Gonzales has not

18

asserted any other argument to the contrary, Pena-Gonzales is not entitled to an evidentiary hearing on this issue.

The district court did not err in denying Pena-Gonzales' K.S.A. 60-1507 motion.

Affirmed.